Sheila C. **ROBINSON**, Plaintiff,

v.

Winfried **MROZ**, M.D. and Honorota M. **Bengzon**, M.D., Defendants.

Superior Court of Delaware, New Castle County.

Submitted March 10, 1981.

Decided June 16, 1981.

C. Waggaman Berl, Jr., Wilmington, for plaintiff.

James W. Semple of Flanzer & Isaacs, Wilmington, for defendants.

WALSH, Judge.

This medical malpractice action is before the Court at the behest of the defendant-physician, Honorota M. Bengzon, M.D., who seeks to strike a decision of a Medical Malpractice Review Panel, which determined that Dr. Bengzon had failed to treat the plaintiff-patient, Sheila C. Robinson, in conformity with community medical standards. Specifically, the Panel determined that: (1) Dr. Bengzon performed a sterilization pro-

cedure on Mrs. Robinson without properly informing her of the risks and alternatives attendant upon such a procedure, and (2) performed the sterilization procedure, a bilateral tubal laparoscopy, below the standard of surgical care practiced in the Dover community. Dr. Bengzon complains that the Panel's opinion contains errors of law and lacks substantial evidential support. The resolution of that motion requires an analysis of the powers and duties of the review panels which were established under the Delaware Health Care Malpractice Insurance and Litigation Act (the Act), 18 *Del.C.* § 6801, *et seq.*, which became effective on April 26, 1976.

## I

Before addressing the merits of Dr. Bengzon's grievance, it is necessary to define the scope of review. The parties are in disagreement concerning whether a "motion to strike" is the appropriate procedural vehicle to permit the Superior Court to review an opinion of the Medical Malpractice Review Panel. Eighteen *Del.C.* § 6811(d) grants "right of review" to any party "aggrieved by the opinion of the panel" through "application" to the Superior Court. Subsection (e) authorizes the Court to "strike any portion of the Panel's opinion which the Court finds to be based on error of law or not supported by substantial evidence." It follows that this Court's examining function includes authority to strike any portion of the Panel's opinion which fails the standard of review. To the extent that the Court strikes any portion of the opinion, the Panel's conclusions are denied the *prima facie* admissibility in any subsequent trial provided by 18 *Del.C.* § 6812. It is obvious that the legislature did not contemplate that an "appeal", in the usual understanding of that term, would be available to an aggrieved party. Indeed, the word "appeal" does not appear in the statute for the reason that the Superior Court already has jurisdiction over the malpractice litigation, in the context of which the Panel referral has been made. Nor is this Court authorized to remand the Panel's

opinion for re-hearing or correction in the absence of specific statutory direction. *Searles v. Darling,* Del.Supr., 83 A.2d 96 (1951); *Wilmington Vitamin & Cosmetic Corp. v. Tigue,* Del.Super., 183 A.2d 731 (1962).

Since the clear purpose which underlies the establishment of the Malpractice Review Panel procedure is to facilitate the presentation of evidence at trial, the Panel's activities might best be viewed as an adjunct to the litigation process. Its functioning is akin to that performed by a master whose findings the appointing court is free to accept or reject, in full or in part. Here, however, the Court's power of review is tempered by the "substantial evidence"—"no error of law" standard imposed by § 6811(e), a test comparable to that which controls appeals from other administrative bodies under the Administrative Procedures Act. 29 *Del.C.* § 6442. Defendant has titled her effort as a "Motion to Strike" since that is the relief she seeks as the result of court review. While a motion entitled "Application For Review" might more precisely track the statute, the discrepancy is not a jurisdictional one since, as previously noted, the Court already controls the underlying litigation. Accordingly, I conclude that defendant's use of the term "motion to strike" is a mere deficiency in form which does not affect the Court's statutory power of review.

## II

The Panel received testimony from only two witnesses: the patient and the physician. Except in the area of informed consent, their testimony is not in conflict. At the time plaintiff came into the care of Dr. Bengzon she was twenty-eight years old and had delivered four children. In December, 1973, plaintiff began to experience severe menstrual cramps which interfered with her employment as a machine operator. She consulted Dr. Winfried Mroz on December 7, 1973, but was referred by Dr.

Mroz to his associate, Dr. Bengzon.[1] At the time of the first visit, Dr. Bengzon discussed the possible significance of plaintiff's intrauterine device (IUD) on her symptoms. When Mrs. Robinson expressed interest in a permanent form of birth control, Dr. Bengzon suggested a "band-aid" or tubal ligation procedure. The parties eventually agreed that Dr. Bengzon would perform a bilateral salpingectomy at the Kent General Hospital the following week. Mr. Robinson executed a document entitled "SPECIAL CONSENT TO OPERATE OR OTHER PROCEDURE" which was witnessed by Dr. Bengzon's nurse. This form included the following language: "I acknowledge that no guarantees have been made to me as a result of the operation or procedure." Mrs. Robinson signed a separate form at the hospital shortly before the operation which also contained language that a "result has not been guaranteed." Mrs. Robinson claims to have signed each document in haste without reading it, because she was told to sign it and was relying upon Dr. Bengzon's oral guarantee that the operation would be a complete bar to further pregnancy.

Dr. Bengzon performed a laparoscopic sterilization, apparently without incident, on December 13, 1973. Mrs. Robinson suffered some discomfort in the following months and in March, 1974, was determined by Dr. Mroz to be pregnant. That pregnancy was surgically aborted on March 18, 1974. On June 11, 1974, a hystero-salpingo-gram was performed which revealed that Mrs. Robinson's left fallopian tube was open or patent. She became pregnant again and delivered a child on May 30, 1975. Following that delivery, Dr. Thomas E. Dyer performed a second bilateral tubal ligation which has apparently been successful.

Dr. Bengzon testified that she had little direct recall of her treatment of Mrs. Robinson and, in particular, any conversation concerning a "guarantee" of the operation's effectiveness. Based on an examination of her office and hospital records, she related

her treatment of the plaintiff as having been performed in a routine and customary fashion. It is, and was, her practice to describe the procedure to the patient and to require the patient to sign the original consent forms before leaving the office. She denies that she has ever guaranteed that any sterilization procedure succeeds in 100 percent of cases and specifically denies giving Mrs. Robinson any such guarantee. She claimed to have performed "twenty to thirty" tubal laparoscopics prior to the Robinson operation without a failure. She is a Fellow of the American College of Obstetrics and Gynecology. Dr. Bengzon testified before the Panel that there are two possibilities for explaining the patency or openness of Mrs. Robinson's left fallopian tube: (1) the tube ends, though cauterized and appearing sealed to the observing physician, may re-open, and (2) the operating physician may mistake the adjacent round ligament for the tube and cauterize it instead. Dr. Bengzon discounts the second possibility since she claims to have traced the ligament in the abdominal cavity and was able to identify it.

The Panel also received in evidence the affidavit of Dr. Robert J. Scacheri, a Board-certified obstetrician practicing in the Dover area, who examined Dr. Bengzon's records and operative notes. It was his opinion that, if Dr. Bengzon was able to identify the fallopian tubes and distinguish them from the rounded ligaments her cauterization of the isthmus of the tube was in conformity with the community standard of medical care.

The Panel, by written opinion, unanimously determined that Dr. Bengzon's professional treatment of Mrs. Robinson was deficient in two respects: failure to inform of the risks of the sterilization procedure as well as improper performance of the procedure, itself. In ruling on the issue of informed consent, the Panel, in effect, simply chose to believe Mrs. Robinson's version of

1. Dr. Mroz was also named as a defendant in this case because he practiced medicine in a professional partnership with Dr. Bengzon. But as the Panel specifically determined, and as plaintiff tacitly concedes, Dr. Mroz had no contact with plaintiff during the period of disputed treatment and he is not directly charged with any act of malpractice.

whether she had been told by Dr. Bengzon that the sterilization was "guaranteed." On the issue of competence, the Panel concluded that the salpingectomy was ineffective because "more likely than not that defendant Bengzon inadvertently fulgerated the rounded ligament rather than the left fallopian tube." In each determination, the Panel rejected Dr. Bengzon's assertions to the contrary. The Panel's findings thus squarely raise the question of whether the resolution of such factual disputes are within its statutory authority. Dr. Bengzon argues strenuously that they are not.

### III

The adjudicative power of a malpractice review panel is statutorily defined in § 6811(b):

"(b) The panel shall have the duty of making a finding as to whether or not in its opinion the evidence supports the conclusion that the defendant or defendants acted or failed to act within the applicable standards of care. After reviewing all evidence and after any hearing before the panel requested by any party, the panel shall, within 30 days, render to the Court a written opinion, including any minority opinion or opinions, signed by the chairperson expressing 1 or more of the following findings:

(1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care;

(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care;

(3) There is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the Court or jury, which issue of fact shall be identified in the opinion; or

(4) The conduct complained of was or was not a factor in the resultant damages, and if so, whether the plaintiff suffered:

a. Any disability and the extent and duration of the disability, and

b. Any permanent impairment and the percentage of the impairment."

■ Apart from its authority to fix causation and impairment, embraced in subpart (4) and a factor not here disputed, the Panel is permitted to express its findings in two areas only. First, whether the evidence presented to it supports the conclusion that a particular health care provider met the applicable standard of care. Secondly, whether the dispute reveals material factual issues, which cannot be resolved by the application of expert opinion, which issues the Panel may identify for resolution at trial. The statutory restrictions placed upon the Panel's findings point up its limited powers. Its composition of medically and legally trained persons, as well as lay members, is intended to provide an informed evaluation of the conduct of the health care provider. As noted previously, in this respect it serves a role analogous to that of a master who assists the Court or trier of fact in evaluating evidence in a specialized area. As the statute indicates, the Panel is permitted to identify, but not determine, issues of fact not requiring expert testimony, such as disputes which turn on credibility.

In addressing the issue of informed consent, the Panel accepted the patient's version of the circumstances under which consent was given, because of such factors as "the demeanor of the parties"; the difficulty experienced by the Panel in understanding Dr. Bengzon, who is of foreign extraction; Dr. Bengzon's "relative inexperience at the time of the operation"; and the "absence of testimony" by the doctor's receptionist who witnessed the execution of one consent form. In applying a credibility approach to resolve the conflict in testimony, the Panel not only embarked on a task foreclosed to it by statute, but failed to identify the legal standard which governed the dispute.

If the issue be viewed as one of a guaranteed result, § 6851 of the Malpractice Act must be considered. It provides:

"No liability shall be imposed upon any health care provider on the basis of an

alleged breach of contract express or implied, assuring results to be obtained from undertaking or not undertaking any diagnostic or therapeutic procedure in the course of health care, unless such contract is set forth in writing and signed by such health care provider or by an authorized agent of such health care provider."

This standard, even if it be deemed not in effect at the time of the treatment in 1973, essentially mirrors prior decisional law, which permitted recovery for failure of a guaranteed surgical result only where there has been an express agreement to that effect, supported by a separate consideration. *Coleman v. Garrison*, Del.Supr., 349 A.2d 8 (1975).

Should the dispute be considered as falling generally within the field of informed consent, the Panel was obliged to apply the statutory standard, which, again, represents no significant departure from common law standards. *See, Wagner v. Olmedo*, Del. Supr., 365 A.2d 643 (1976). The statutory standard, embraced in § 6852, necessarily requires proof of community custom:

"(a) No recovery of damages based upon a lack of informed consent shall be allowed in any action for malpractice unless:

(1) The injury alleged involved a non-emergency treatment procedure or surgery;

(2) The injured party proved by a preponderance of evidence that the health care provider did not supply information regarding such treatment, procedure of surgery, to the extent customarily given to patients or other persons authorized to give consent for patients, by other licensed health care providers with similar training and/or experience in the same or similar health care communities as that of the defendant at the time of the treatment, procedure or surgery."

The Panel made no effort to apply any community medical standard to gauge the adequacy of Dr. Bengzon's discussion with Mrs. Robinson or to determine whether any express contractual undertaking existed. The Panel's resort to fact-finding to resolve that aspect of the patient-physician dispute is impermissible under the Act since it invades the fact-finding province reserved to the Court and/or jury at trial. To afford such findings even *prima facie* effect might well jeopardize the constitutional right to jury trial which is the entitlement of every litigant in a medical malpractice action. *See, Lacy v. Green*, Del.Super., 428 A.2d 1171 (1981).

■ I conclude that the Panel's determination that Dr. Bengzon failed properly to inform Mrs. Robinson of the risks of a bilateral salpingectomy, constitutes a factual determination of a material issue of fact, not requiring expert opinion. As such, that portion of the Panel's opinion is outside the statutory scope of its activities and not entitled to *prima facie* admissibility at trial. It is accordingly stricken.

IV

The focus next shifts to the Panel's determination that in performing the bilateral salpingectomy on December 13, 1973, Dr. Bengzon "did not exercise that degree of skill ordinarily supplied by obstetrician-gynecologist in the Dover community." While this conclusion is clearly within the Panel's authority, its findings in support thereof are questionable. Again, the analysis must begin with the statutory or decisional standard which guides the Panel's task. In particular, it is necessary to determine to what extent the Panel here fixed the standard of care in the absence of, or contrary to, expert medical testimony.

■ The need for expert medical testimony upon which to posit liability in a medical malpractice action had been clearly established under Delaware case law prior to the advent of the Medical Malpractice Act. *Christian v. Wilmington General Hospital Ass'n.*, Del.Supr., 135 A.2d 727 (1957); *Peters v. Gelb*, Del.Supr., 314 A.2d 901 (1973). The only exception to this requirement, would appear to be in those cases where the act under scrutiny is such a clear departure from the norms of ordinary care that a person of ordinary experience could

evaluate it. *Larrimore v. Homeopathic Hospital Ass'n of Del.*, Del.Supr., 181 A.2d 573 (1962).

The Act particularized the need for expert medical testimony and defined those cases in which a rebuttable inference of negligence could arise without it.

"§ 6853 Requirement of expert medical testimony.

No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death, except that such expert medical testimony shall not be required if a malpractice review panel has found negligence to have occurred and to have caused the alleged personal injury or death and the opinion of such panel is admitted into evidence; provided, however, that a rebuttable inference that personal injury or death was caused by negligence shall arise where evidence is presented that the personal injury or death occurred in any 1 or more of the following circumstances: (1) A foreign object was unintentionally left within the body of the patient following surgery; (2) an explosion or fire originating in a substance used in treatment occurred in the course of treatment; or (3) a surgical procedure was performed on the wrong patient *or the wrong organ*, limb or part of the patient's body. Except as otherwise provided herein, there shall be no inference or presumption of negligence on the part of a health care provider."

Since the Panel was here concerned with the effectiveness of a specific surgical procedure, it required expertise to articulate both the appropriate community standard and adherence or non-adherence to the standard. Plaintiff contends that the stan-

dard was secured through the Panel's informed evaluation of Dr. Bengzon's testimony. Dr. Bengzon argues that the Panel's opinion is unsupported by any medical testimony since she herself denied any deviation from the appropriate standard of care and Dr. Scacheri's affidavit supported her denial. While § 6851 imposes a requirement that liability be established only through the presentation of expert medical testimony *or* through the findings of a review panel that negligence exists, the statute would appear to be directed to the evidential standard at trial. It is only at that stage that liability is fixed. A fair reading of the statute supports the argument that the Panel's opinion is, itself, a substitute for expert medical testimony. Moreover, § 6804 of the Act delineates panel membership to insure the presence of at least one physician, an indication that the Panel is expected to bring to the controversy an informed judgment.[2]

The key finding of incompetence which the Panel found on the evidence presented to it, was that it was "more likely than not that defendant Bengzon inadvertently fulgerated the rounded ligament rather than the left fallopian tube." This finding was made in the face of Dr. Bengzon's testimony that she had traced the rounded ligament to distinguish it from the left fallopian tube and was satisfied that she had not mistaken it for the fallopian tube. Although Dr. Bengzon testified that a recanalization was a possible cause of the pregnancy, the Panel noted "the absence of any evidence" to "explain away" this unintended result.

Although Dr. Bengzon was the only expert witness who appeared before the Panel, it chose not to accept her explanation for the tube patency, in part because of the "absence of any affirmative, independent testimony" that her actions measured up to

---

2. 18 *Del.C.* § 6804(a) provides:

"(a) Each malpractice review panel convened in an action shall be composed of 5 voting members and shall include 2 health care provider members, at least 1 of whom shall be a physician, and the other 1 of whom shall, be if available, from 1 of the health care disci-

plines involved in such action, 1 attorney and 2 lay persons who are not health care providers nor licensed to practice law nor associated with the insurance industry. The attorney member shall act as chairperson of the panel and shall preside at all meetings."

applicable community standards. This approach, in effect, shifted the burden of proof to Dr. Bengzon to establish by testimony other than her own that the sterilization procedure was ineffective for reasons other than professional negligence. In rejecting any explanation but that of inadvertent cauterization of the rounded ligament, the Panel equated the result with negligence and placed upon Dr. Bengzon the burden of proving the contrary. Moreover, the Panel's offhand rejection of Dr. Scacheri's affidavit because it "assumed that very facts in controversy," illustrates the Panel's misunderstanding of its authority to resolve factual issues.

If, as its opinion indicates, the Panel rejected Dr. Bengzon's expert testimony, what did it use as a postulate for fixing professional incompetence? The Panel neither appointed disinterested experts as authorized by § 6810 of the Act nor, presumably, consulted any "persons, texts or other authorities" as permitted by § 6811(c). In the latter event, the Panel is required to identify such sources in its opinion which it did not do. If the Panel members had recourse to the expertise of its members, the parties were entitled to be informed of that fact and afforded an opportunity to comment upon such information, to the same extent as §§ 6809 and 6810 afford with respect to third-party opinions and information. To permit the panel to substitute its unarticulated expertise as a basis for its conclusion would deny to the losing party the opportunity to rebut at trial the *prima facie* force of the Panel's findings. This does not mean that the Panel is not permitted to avail itself of the informed judgment of its expert members; otherwise, the Panel concept would fail of one of its essential purposes. But, where as here, the Panel rejects the only expert testimony offered before it, it may not substitute another view without notice to the parties and opportunity to rebut.

 I conclude that, to the extent that the Panel here rejected the testimony of Dr. Bengzon and the affidavit of Dr. Scacheri, its conclusions of incompetence were without a community standard against which to measure the medical care under scrutiny. The Panel's opinion thus *both* lacks substantial evidential support and is erroneous as a matter of law. Accordingly, the Panel's opinion that Dr. Bengzon performed the tubal salpingectomy below the applicable standard of medical care in the Dover community must also be stricken.

## V

In conclusion, both principal findings of the Panel must be denied *prima facie* effect at trial because of the Panel's basic misconception of its function. Although the good faith intention of the Panel is not in question, the use of its findings in this case would seriously handicap one of the parties in the litigation and markedly distort the evidential process at trial. For this reason, the Panel's conclusions concerning Dr. Bengzon's conduct are stricken.

IT IS SO ORDERED.