Shirley F. RUSSELL and James A. Russell, Plaintiffs Below, Appellants,

v.

Margo KANAGA, M.D., Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 7, 1989.
Decided: Jan. 23, 1990.
Rehearing Denied: March 12, 1990.

Bruce L. Silverstein (argued), and Ben T. Castle of Young, Conaway, Stargatt & Taylor, Wilmington, for appellants.

John A. Parkins, Jr. of Richards, Layton & Finger, Wilmington, for appellee.

Before CHRISTIE, C.J., HOLLAND, J. and HARTNETT, Vice Chancellor (sitting by designation pursuant to Del. Const. art. IV, § 12).

HOLLAND, Justice:

This is an appeal from a jury verdict in favor of the defendant-appellee, Margo Kanaga, M.D. ("Dr. Kanaga"), in a medical malpractice action. In this appeal, the plaintiff-appellants, Shirley F. Russell and James A. Russell ("the Russells") contend that the Superior Court erred by not allowing the written opinion of a medical malpractice review panel ("the Panel") to be introduced as evidence. Dr. Kanaga has filed a cross-appeal, in which she asserts that the Superior Court erred in denying her motion for a directed verdict. We have concluded that the Superior Court erred, as a matter of law, in both respects.

*Facts*

On January 8, 1982, Dr. Kanaga initially examined Mrs. Russell, who complained of urinary incontinence, and diagnosed a urinary disorder. On January 25, 1982, Dr. Kanaga performed a cystoscopy to confirm that diagnosis. Dr. Kanaga determined that Mrs. Russell suffered from a rectocele, a cystocele, stress incontinence, and a prolapsed uterus.[1] Dr. Kanaga recommended the repair of the rectocele and the cystocele to Mrs. Russell, and that she also have a vaginal hysterectomy. Mrs. Russell consented to have Dr. Kanaga perform the medical procedures, as recommended.

Mrs. Russell was admitted to the hospital on February 21, 1982. The surgery was performed on February 24, 1982. While performing the surgery, Dr. Kanaga inadvertently cut Mrs. Russell's bladder. Dr. Kanaga testified that the laceration was approximately one-half centimeter in size and was located on the lower portion of the left side of Mrs. Russell's bladder. The parties agree that Dr. Kanaga immediately recognized the cut to the bladder and stitched it with "OO" chromic suture material. Thereafter, Dr. Kanaga completed the vaginal hysterectomy and repaired both the rectocele and the cystocele.

After surgery, Dr. Kanaga apparently advised Mrs. Russell of the laceration to her bladder and the corrective action that had been taken. Dr. Kanaga then attempted to determine whether she had successfully repaired the laceration by injecting a blue dye into Mrs. Russell's bladder and checking for any leakage. Although the test was inconclusive, Dr. Kanaga was of the opinion that she had successfully repaired the laceration to Mrs. Russell's bladder and made no further attempt to substantiate her conclusion.

Mrs. Russell was discharged from the hospital on March 4, 1982. However, she was readmitted four days later when she experienced severe abdominal pain and high fever. Mrs. Russell remained hospitalized for more than a month. The pain, which Mrs. Russell had never previously experienced, appeared to be intractable. Her pain was not alleviated by medical treatment.

On April 5, 1982, Dr. Charles Hobbs, M.D. ("Dr. Hobbs") performed an exploratory laparotomy to determine the cause of Mrs. Russell's symptoms. Dr. Hobbs found that Mrs. Russell's bladder, fallopian tube and sigmoid colon were adhering together. A sample of the tissue found and removed by Dr. Hobbs was subsequently analyzed microscopically by Dr. Park Huntington, M.D. ("Dr. Huntington"), a pathologist, who discovered the presence of suture material.[2] Although Mrs. Russell was discharged from the hospital on April 18, 1982, her symptoms continued. She was hospitalized at Johns Hopkins Hospital on ten occasions after April 18, 1982.

On March 20, 1983, the Russells commenced a malpractice civil action against Dr. Kanaga, alleging various acts of medical negligence.[3] On December 10, 1984,

---

1. According to the medical testimony in the record, a rectocele is a condition caused by a weakness of the vagina which allows a portion of the rectum to protrude into the vagina, thus forming a pouch in the rectum. Similarly, a cystocele is a pouch formed in the bladder because of a weakness in the wall of the vagina.

2. As described in the written opinion of the malpractice review panel:

During the April 5 surgery, Dr. Hobbs found that the "antemesentric border of the mid-sigmoid colon was fused to the left dome of the bladder and this was encased in chronic inflammation and scar." Moreover, the left fallopian tube, the right ovary, and the right fallopian tube were also removed. The left fallopian tube was observed to be quite red and inflamed and was also "adherent to the attachment of sigmoid colon to bladder." The inflammatory tissue connecting the sigmoid colon to the bladder was sent to the Pathology Department where it was examined by Dr. Park Huntington, as were the left tube, right tube, and right ovary. During his microscopic examination, Dr. Huntington found in the specimen of inflammed [sic] tissue connecting the sigmoid colon to the bladder material "consistent with suture material, probably of animal origin...."

3. Specifically, the complaint alleged that during the February 24, 1982, surgery, Dr. Kanaga was negligent in the following respects:

(a) The hysterectomy that was performed should not have been performed vaginally based on the plaintiff's condition, and had a thorough examination been conducted in ad-

Dr. Kanaga's attorney filed a demand to convene a malpractice review panel, pursuant to the Health Care Malpractice Insurance and Litigation Act. 18 *Del.C.* § 6802.[4] Accordingly, a panel was selected consisting of two doctors (a specialist in family practice medicine and a specialist in thoracic surgery), two lay persons, and an attorney admitted to the Delaware bar.[5] 18 *Del.C.* § 6805.

The Panel convened to hear Mrs. Russell's case on June 24, 1985, and heard testimony from various witnesses, including Mrs. Russell and Dr. Kanaga. In her testimony before the Panel, Dr. Kanaga readily admitted that suturing the bladder to the colon would constitute a departure from the acceptable standard of care. However, Dr. Kanaga denied having sutured Mrs. Russell's bladder to her sigmoid colon. The only explanation Dr. Kanaga offered the Panel for Dr. Huntington's discovery of suture material in the tissue dissected from between Mrs. Russell's bladder and her colon was that it must have been from surgery performed on Mrs. Russell in 1951 or 1952.

In response to Dr. Kanaga's explanation of the source of the suture material, the

Russells presented the Panel with the sworn affidavit of Zane D. Wetzel ("Wetzel"), a sales representative for the Ethicon Division of Johnson & Johnson Corporation from February of 1980 through November of 1983. 18 *Del.C.* §§ 6807–6808. The Wetzel affidavit (1) estimated the absorption rate of "Chromic OO" sutures into the human body under normal circumstances to be between 90 and 180 days; (2) offered an opinion, "based on reasonable professional certainty," that the suture material found in the tissue dissected from between Mrs. Russell's bladder and her sigmoid colon by Dr. Hobbs was "a product of a surgical procedure performed approximately 6 weeks earlier on February 24, 1982;" and (3) stated that "the suture [material] referenced in [Dr. Huntington's] pathology report could not have been a product of a surgical procedure performed several years prior to that date."

At the conclusion of the hearing, which was continued on August 5, 1985, to accommodate Dr. Hobbs' schedule, the Panel took the case under advisement. The Panel rendered its written opinion on August 29, 1985. By its opinion, the Panel found that Dr. Kanaga was not negligent on all counts. The Panel's conclusions were

vance of the surgery, it would have been or should have been apparent to the defendant that this type of surgery should not be performed;

(b) In the course of performing the vaginal hysterectomy the defendant lacerated the plaintiff's bladder;

(c) Following laceration of the bladder, the defendant undertook to repair the laceration and proceeded to suture portions of the lacerated bladder to the plaintiff's colon;

(d) Subsequent to the surgery and its complications, the defendant failed to communicate the nature and extent of the problem to plaintiff Shirley F. Russell and failed to apprise her of the severe consequences that would follow this procedure and withheld pertinent information from her and failed and declined to inform other subsequent treating physicians of the nature and extent of the complications suffered by this plaintiff so as to aid them in their necessary subsequent treatment of the plaintiff;

(e) In the first instance, the defendant failed to advise and inform the plaintiff of all of the complications of the surgery that would be performed and which could result in the difficulties subsequently experienced by this plaintiff, and withheld all pertinent and mate-

rial information from her that would have caused her to decline to undergo such surgery had she been informed of the severe and dire consequences which did in fact ensue.

4. 18 *Del.C.* § 6802(b) provides:

In any civil action alleging malpractice at any time after the filing of an answer or any motion filed in lieu thereof, any party shall have the right to convene a malpractice review panel as herein provided by filing a demand therefor with the Prothonotary, all parties and the [Insurance] Commissioner, and the Commissioner shall promptly convene such panel upon such demand, provided that the [Superior] Court may postpone the convening of such panel for good cause shown by any party.

5. Pursuant to 18 *Del.C.* § 6804, the attorney acted as chairperson, and the Insurance Commissioner designated an additional individual to sit as a nonvoting *ex officio* member of the panel responsible for providing the panel members with copies of documents submitted as evidence on behalf of the parties. *See generally* 18 *Del.C.* ch. 68; *Brooks v. Johnson*, Del.Supr., 560 A.2d 1001, 1003 (1989).

unanimous with respect to all of Dr. Kanaga's alleged acts of negligence, with one exception—whether Dr. Kanaga had sutured Mrs. Russell's bladder to her sigmoid colon. On this issue, three members of the panel concluded that Dr. Kanaga did not suture Mrs. Russell's bladder to her colon, and two members of the panel concluded that the evidence supported the conclusion that Dr. Kanaga did stitch the two organs together.

After receiving the written opinion of the Panel, the Russells decided to abandon the claims which the Panel had unanimously rejected, and to only pursue the single claim of negligence which had gained the support of two panel members.[6] Accordingly, at trial, the Russells' exclusive argument was that Dr. Kanaga must have sutured Mrs. Russell's sigmoid colon to the dome of her bladder during surgery. They contended that the piece of suture material found by Dr. Huntington, in the tissue taken by Dr. Hobbs, was proof that such improper suturing had occurred. In support of their position at trial, the Russells presented testimony by Dr. Michael Ray Spence, M.D. ("Dr. Spence") and Dr. John Bartlett, M.D. ("Dr. Bartlett").

Although the portion of the Russells' case which they chose to pursue at trial remained identical to that presented to the Panel, the defense presented at trial by Dr. Kanaga on that issue differed in some respects from the defense presented to the Panel. Consistent with her testimony before the Panel, Dr. Kanaga agreed that *if* the bladder had been sutured to the sigmoid colon, such suturing would have constituted a departure from the applicable standard of care, and again strenuously denied that she had sutured the bladder to the colon. However, a new aspect of Dr. Kanaga's defense, by which the Russells claim to have been surprised, no longer relied upon the thirty-year old surgery as being the source of the suture material discovered following Dr. Hobb's exploratory surgery.

According to Dr. Kanaga's trial defense, the existence of suture material found in the tissue sample taken by Dr. Hobbs is explained by a portion of the surgical procedure which actually took place outside of Mrs. Russell's body. According to Dr. Kanaga, near the end of the procedure, after the uterus is outside of the patient's body, it is still connected to the fallopian tubes. The surgeon clamps the fallopian tubes near the point where they join the uterus, severs them from the uterus, and places a lasso stitch around the bottom end of the fallopian tube.[7] When the clamp is released, the fallopian tube retracts itself up

---

6. In pertinent part, the minority view was reported in the Panel's written opinion as follows:

Dr. Kanaga suggests that the suture material found by Dr. Huntington may have been residue from surgery performed on Mrs. Russell in 1952 since the left dome of the bladder was much closer to the situs of that surgery. The minority members of the panel reject that explanation for two reasons. First, the testimony of Dr. Kanaga, Dr. Yaswinski, Dr. Hobbs, and Dr. Huntington, and the affidavit of Zane Wetzel, support the conclusion that chromic sutures do not last thirty years but are absorbed into the body within a relatively short period of time. Second, Dr. Huntington's analysis indicates that the suture material he found was amorphous in appearance, thus probably of animal origin (i.e., chromic) rather than silk or nylon suture material. The argument that the location of the laceration (and its repair) was so distant from the location of the adherence that there must be no connection fails, in the minority's view, when weighed against the undisputed evidence that suture material was present in the inflammatory tissue connecting the bladder and the colon. The minority agrees with the plaintiffs' argument that if there were any evidence to dispute the existence of suture material in the tissue, it would have been presented by the defendant.

The minority members of the panel are also influenced, but to a lesser extent, by the sheer coincidence of events. To them, it taxes the imagination to accept the proposition that the problems which developed in the bladder area of an otherwise healthy woman only twelve days after a surgical procedure which admittedly damaged her bladder were unrelated to that surgery.

7. At trial, Dr. Kanaga also testified that Mrs. Russell's surgery was performed with Mrs. Russell in the "trendelenberg" position, which refers to a situation in which the foot of the operating table is elevated so that the patient's hips are higher than her head. In such a position, as Dr. Kanaga testified, the bowels tend to fall away from the operative sight thereby making it "impossible" to accidentally suture the bladder to the colon.

into the body and carries the lasso suture with it. According to Dr. Kanaga's trial defense, the microscopic piece of suture material found by the pathologist was probably a remnant of the lasso stitch placed on the end of the fallopian tube.[8]

Dr. Kanaga also testified at trial that the fact that Dr. Hobb's found the bowel, bladder and fallopian tube adhering together, does not necessarily mean that medical negligence had occurred. Dr. Kanaga testified that organs can adhere together as a natural process, either as the result of infection, or as a result of naturally occurring adhesions. According to Dr. Kanaga, the inflamed fallopian tubes, which Dr. Hobbs found, could have caused the adhesion of the bowel, bladder and fallopian tube in this case.[9]

The Russells were not only surprised by Dr. Kanaga's new defense, but also by Dr. Kanaga's failure to introduce the Panel's written opinion into evidence. When it became apparent that Dr. Kanaga's attorney did not intend to offer the Panel's opinion into evidence, the Russell's attorney sought to do so. Dr. Kanaga's attorney objected to the admission of the written Panel opinion, and the Superior Court sustained the objection.

The Superior Court based its decision on the fact that the Panel's opinion included a summary of testimony that was presented by witnesses who were not expected to be called at trial. Expressing concern that the admissibility of the written Panel opinion would constitute a departure from the ordinary rules of evidence,[10] excluding the admission of hearsay testimony, the Superior Court stated:

I think the statute, in referring to the fact that witnesses who appeared before the panel can be called to trial, implies

that the purpose was not to give their testimony in summarized form. If we introduce the whole report, we have references to testimony—at least one witness who has been identified who won't be a witness at trial at all.[11]

### Admissibility of the Medical Malpractice Panel's Opinion

▪ Whether the Panel's written opinion was admissible as evidence at trial, even though it contained hearsay, is a question of first impression arising under the Health Care Malpractice Insurance and Litigation Act ("the Act"), 18 *Del.C.* ch. 68. The General Assembly adopted the Act in 1976, in response to what was perceived to be a crisis in the continued availability of medical care, as a result of medical malpractice litigation. In passing the Act, the General Assembly specifically decided to make make modifications to the Delaware legal system, as it relates to health care malpractice claims. The preamble to the legislation stated, in part:

WHEREAS, the General Assembly determines it is necessary to make certain *major modifications to its current legal system as it relates to health care malpractice claims* if the citizens of Delaware are to continue to receive a high quality of health care while still assuring that any person who has sustained bodily injury or death as a result of a tort or breach of contract on the part of a health care provider resulting from professional services rendered, or which should have been rendered, can obtain a prompt determination of adjudication of that claim and receive fair and reasonable compensation from financially responsible health care providers who are able to insure their liability, under a strictly construed

---

8. Dr. Kanaga admitted that this explanation had been recently developed.

9. The Russells did not contend, at trial, that Dr. Kanaga did anything improper to cause the inflammation of the fallopian tubes.

10. *See* D.R.E. 801–806.

11. It also appears from the record that the Superior Court sustained the objection on the alternative basis that the potential for confusion

outweighed any probative value of the opinion. *See* D.R.E. 403. When asked for a proffer as to the Panel opinion's relevance, Russell's counsel responded that he sought to introduce the report *to* show that Dr. Kanaga's explanation of why the suture material was found had been recently developed. Dr. Kanaga had already testified that her explanation had been developed recently.

fault principal as now, at a cost which is not prohibitive and does not lead to the problems and practices described above, while still *maintaining Delaware's overall legal system* as to health care malpractice claims *except as modified by this legislation.*

60 Del.Laws ch. 373 (1976) (Preamble) (emphasis added); *See also Lacy v. Green,* Del.Super., 428 A.2d 1171, 1174 (1981). The Act itself provides:

This chapter applies to actions, cases and proceedings brought after April 26, 1976, and also applies to any further conduct of actions, cases and proceedings then pending, except to the extent that application of this chapter would not be feasible, or would work injustice, in which event former procedures apply.

18 *Del.C.* § 6857.

One of the major modifications to the Delaware legal system was the provision establishing medical malpractice review panels "to the extent necessary to carry out" the Act. 18 *Del.C.* § 6803. The statutorily prescribed function of a malpractice review panel is to "render to the [Superior] Court a written opinion, *including any minority opinion or opinions,*" expressing findings respecting (i) the defendant's conformity with the applicable standard of care, (ii) whether there exists a material issue of fact that does not require expert testimony, and (iii) causation and the extent and duration of the plaintiff's injury or impairment. 18 *Del.C.* § 6811(b) (emphasis added). The statute explicitly requires that "[a]ny opinion rendered by a malpractice review panel shall state the grounds upon which it is based and ... identify the persons, texts or other authorities which were consulted by the panel in reaching its conclusion." 18 *Del.C.* § 6811(c). This subsection also provides that the *panel's opinion "shall be admissible as prima facie evidence in any proceeding before the Superior Court." Id.* (emphasis added).

The Act provides two opportunities for challenging an opinion which is rendered by a medical malpractice review panel. The first is before a panel opinion is admitted as evidence at trial. 18 *Del.C.* § 6811. After a medical malpractice opinion is issued, any party aggrieved by an opinion of a panel has a right to file a pretrial application for review by the Superior Court. 18 *Del.C.* § 6811(d). Following its review, the Superior Court is authorized to "strike any portion of the panel's opinion which the Court finds to be based on error of law or not supported by substantial evidence." 18 *Del.C.* § 6811(e).[12] "To the extent that the [Superior] Court strikes any portion of the opinion, the Panel's conclusions are denied the *prima facie* admissibility in any subsequent trial provided by 18 *Del.C.* § 6812." *Robinson v. Mroz,* Del.Super., 433 A.2d 1051, 1053 (1981). A failure to assert these statutory pre-trial bases for challenging a panel's opinion, within the thirty-day requirement of 18 *Del.C.* § 6811(d), constitutes a waiver. *Everett v. Nejad,* Del. Supr., 493 A.2d 969, 971 (1985) *overruled on other grounds Brooks v. Johnson,* Del. Supr., 560 A.2d 1001, 1004 (1989).

The second opportunity for challenge arises during the trial. 18 *Del.C.* § 6812. Section 6812 of the Act *reiterates* the provision in Section 6811 that *a written opinion of a malpractice review panel·"shall be admissible as prima facie evidence in the pending Superior Court action brought by the claimant."* (emphasis added). Thus, a panel's opinion, unless modified by the Superior Court, pursuant to the procedure set forth in 18 *Del.C.* § 6811, is admissible in the Superior Court trial. 18 *Del.C.* § 6812. Nevertheless, an opportunity to challenge a panel's opinion at trial is set forth in the Act, which provides that "any party shall have the right to call, at said party's cost, any witness who appeared before or submitted reports to the malpractice review panel as a witness." 18 *Del.C.* § 6812. "If called, the witness shall be required to appear and testify." *Id.*

The Act expressly contemplates that the opinion of a medical malpractice review

---

**12.** The mechanics of this review process are described in *Robinson v. Mroz,* Del.Super., 433 A.2d 1051 (1981).

panel will contain hearsay. The Act *mandates* that a panel's opinion "identify the persons, texts or other authorities [relied upon] by the panel members in reaching its conclusion." 18 *Del.C.* § 6811(c).[13] Therefore, by its very nature, every opinion of a medical malpractice review panel is an amalgamation of hearsay. If the admissibility of a panel's opinion at trial was subject to the ordinary hearsay rules, it would never be received as evidence.

The statutory framework of the Act, which establishes medical malpractice review panels and the procedures for challenging panel opinions, is unique in its design and gives the opinion of a medical malpractice review panel independent evidentiary significance. The Act has withstood constitutional challenges based upon due process, equal protection and the right to trial by jury. *DiFilippo v. Beck*, 520 F.Supp. 1009 (D.Del.1981); *Brooks v. Johnson*, 560 A.2d at 1002 (the statute meets constitutional standards); *Lacy v. Green*, Del.Super., 428 A.2d 1171 (1981). We now hold that the methods which the Act provides for challenging the conclusions set forth in a panel opinion, before and during trial, are legally adequate, even though the Act precludes hearsay objections to the admissibility of a panel opinion at trial. *See DiFilippo v. Beck*, 520 F.Supp. at 1018; *Brooks v. Johnson*, 560 A.2d at 1003. To the extent that the Act has modified the procedures and rules of evidence which govern other legal proceedings in Delaware, it is controlling. 18 *Del.C.* § 6857.

Section 6812, unlike Section 6811 of the Act provides no statutory basis for any judicially imposed limitation upon the admissibility of a malpractice review panel's written opinion, at trial, including any minority opinion or opinions. In sustaining Dr. Kanaga's hearsay objection, the Superior Court disregarded the change in the Delaware legal system created by the Act, which gave independent evidentiary significance to an opinion by a medical malpractice review panel. The decision of the Superior Court, not to admit the Panel opinion

in this case, was contrary to the directives of the Act and, therefore, erroneous as a matter of law. Consequently, we must examine the effect of the Superior Court's decision denying the Russells' motion to admit the Panel opinion as evidence at trial.

Section 6853 of the Act relieves the plaintiff of the obligation of presenting expert medical testimony, "if a malpractice review panel has found negligence to have occurred and to have caused the alleged personal injury or death and the opinion of such panel is admitted into evidence." 18 *Del.C.* § 6853. In the Russells' case, a *majority* of the Panel found that Dr. Kanaga was *not* negligent. The admission of the Panel's entire opinion into evidence would have placed the minority view, in favor of the Russells' position, before the jury. However, the Act does not afford the minority view the status of *prima facie* evidence. Therefore, the Russells would still have been required to present expert testimony, or to establish the applicability of another exception to that requirement, in accordance with 18 *Del.C.* § 6853.

■ If the Russells had succeeded in having the Panel opinion admitted into evidence at trial, it would have been a Pyrrhic victory. As evidence, the Panel opinion would have constituted *prima facie* evidence that Dr. Kanaga was *not* negligent. 18 *Del.C.* § 6812. In this case, the Superior Court's decision not to admit the Panel opinion, at the Russells request, was not reversible error.

### Dr. Kanaga's Motion for a Directed Verdict

At the close of the Russells' case, and again at the close of all the evidence, Dr. Kanaga's attorney moved for a directed verdict. The grounds for the motion, among others, were that the Russells failed to introduce expert testimony that Dr. Kanaga deviated from the standard of care and, alternatively that the Russells failed to introduce any expert testimony that

---

**13.** In addition, this Court has recently held that "members of a medical malpractice review panel may not be subpoenaed, called as witnesses, or deposed in companion litigation regarding their decisions." *Brooks v. Johnson*, 560 A.2d at 1002.

Mrs. Russell's injuries were proximately caused by the alleged malpractice. Dr. Kanaga's motion for a directed verdict was denied on both occasions.

■ On appeal from the Superior Court's denial of a motion for a directed verdict, the standard of review is whether the evidence and all reasonable inferences that can be drawn therefrom, taken in the light most favorable to the nonmoving party, raise an issue of material fact for consideration by the jury. *Moody v. Nationwide Mut. Ins. Co.*, Del.Supr., 549 A.2d 291, 294 (1988); *Law v. Gallegher*, Del. Supr., 197 A. 479 (1938). Applying that test to the circumstances presented here, we find the record does not support the Superior Court's conclusion that there was a material issue of fact as to whether Dr. Kanaga negligently performed the surgery and caused the symptoms complained of by Mrs. Russell.

The record reflects that Dr. Spence, one of the Russells' experts, did opine that Mrs. Russell's problems were the result of adhesions. However, Dr. Spence also stated that it is not medical negligence to cause adhesions, since all surgery leaves adhesions, which are the result of the human body's natural healing process.[14]

Dr. Bartlett, another of Mrs. Russell's treating physicians, testified that he was unable to find a nexus between Mrs. Russell's problems and the surgery performed on her by Dr. Kanaga. Dr. Bartlett, who is chief of infectious diseases at Johns Hopkins Hospital and was in charge of Mrs.

Russell's care at that medical institution, testified, in part:

Q. Have you ever formed an impression as to whether Mrs. Russell's current problems, at least the ones when presented to you with, were causally related to her surgery performed by Doctor Kanaga?

A. Well, I never was impressed that there was an identifiable cause of pain. That is why we call it pain of unknown etiology. And I certainly was not able to say it was due to the surgery that had been performed, nor were we ever able to find any organic cause of the pain.

. . . .

Q. And for the last time, then, as I understand it, you have been unable to link her current complaints or the complaints she was having when you saw her with the surgery performed by Doctor Kanaga?

A. That is correct. We—as far as I know, we did every test that is feasible for describing the etiology of pain. She had a diagnostic evaluation that, in my view, is unparalleled. In fact, we may have gone overboard, I think in part because she kept coming back and presenting with what she perceived as such severe pain. But in the process of doing that, we could never identify a specific etiology nor could we come up with a beneficial plan of her therapy.

Q. Did any of these battery of tests which you had performed on Mrs. Russell point to the surgery performed by Doctor Kanaga?

---

14. In part, Dr. Spence testified:

Q. Now, you have told us that to a reasonable degree of medical probability, Mrs. Russell's pain was caused by adhesions, right?
A. That's correct.
Q. And you have also told us that it is not malpractice to cause adhesions. Am I correct?
A. Yes, sir.
Q. And you were never able though, were you, to develop a definitive diagnosis as to exactly what was causing her pain, were you?
A. Other than my opinion being that her pelvic adhesions were the source of her discomfort. That is as close as I could ever come to an exact diagnosis.
. . . .

Q. And I think you also told the jury that there is no such thing as surgery that doesn't leave adhesions behind. Is that correct?
A. Not to my knowledge, there isn't.
Q. And in other words, you can't have scarless surgery?
A. I am not aware of situation where you can have a scarless surgery.
Q. And you wouldn't then fault Dr. Kanaga in any way if she had performed surgery and there were adhesions after that surgery?
A. Absolutely not.
. . . .
Q. So the fact is if there were adhesions in there, that is not anybody's fault?
A. As best we understand what goes on in the healing of the human body, that's correct.

### A. No.

"The need for expert medical testimony upon which to posit liability in a medical malpractice action had been clearly established under Delaware case law prior to the [enactment of the Act]." *Robinson v. Mroz*, 433 A.2d at 1056 (citing *Christian v. Wilmington Gen. Hosp. Ass'n.*, Del.Supr., 135 A.2d 727 (1957); *Peters v. Gelb*, Del. Supr., 314 A.2d 901 (1973)). However, "[t]he Act particularized the need for expert medical testimony and defined those cases in which a rebuttable inference of negligence could arise without it." *Id.* at 1057. According to the mandate of the Act "[no] liability shall be based upon asserted negligence unless expert medical testimony is presented as to [*both*] the alleged deviation from the applicable standard of care in the specific circumstances of the case *and* as to the causation of the alleged personal injury." 18 *Del.C.* § 6853 (emphasis added). *See Wahle v. Medical Center of Delaware, Inc.*, Del.Supr., 559 A.2d 1228, 1231 (1989).

In their complaint, the Russells alleged that Dr. Kanaga committed medical negligence by suturing Mrs. Russell's bladder to her colon. In their answering brief in this Court, the Russells stated "[a]lthough it is true that no expert medical witness ever stated directly that there was a reasonable medical probability that Dr. Kanaga sutured Mrs. Russell's bladder to her colon, there can be little question but that the expert medical testimony that was presented to the jury was sufficient to permit the jury to infer that Dr. Kanaga did just that." The Russells rely upon *Strauss v. Biggs*, Del.Supr., 525 A.2d 992 (1987). *Strauss* does not support the Russells' position. In *Strauss*, this Court specifically recognized the requirements for expert medical testimony set forth in the Act and found that "[t]here was expert testimony indicating that Dr. Strauss' failure to perform the [operative procedure] deviated from the applicable standard of care." *Id.* at 997.

The Russells failed to produce any expert testimony that Dr. Kanaga deviated from the applicable standard of care. *A fortiori*, the Russells were unable to produce any expert testimony that Mrs. Russell's pain was caused through the medical negligence of Dr. Kanaga. In the absence of such expert medical testimony, or the applicability of an exception to that requirement, the Superior Court erred, as a matter of law, in not granting Dr. Kanaga's motion for a directed verdict. 18 *Del.C.* § 6853.[15]

### Conclusion

The Superior Court erred in not admitting the opinion of the medical malpractice panel into evidence, as requested by the Russells. Nevertheless, the Russells were not prejudiced thereby because, even if the Panel opinion had been admitted, the Superior Court would have erred in not granting Dr. Kanaga's motion for a directed verdict.[16] The rulings of the Superior Court are REVERSED. This case is REMANDED to the Superior Court for the purpose

---

**15.** The exceptions recognized by the Act are not applicable in the Russells' case. The Act provides that "such expert medical testimony shall not be required if a malpractice review panel has found negligence to have occurred and to have caused the alleged personal injury or death and the opinion of such panel is admitted into evidence; provided, however, that a rebuttable inference that personal injury or death was caused by negligence shall arise where evidence is presented that the personal injury or death occurred in any 1 or more of the following circumstances: (1) A foreign object was unintentionally left within the body of the patient following surgery; (2) an explosion or fire originating in a substance used in treatment occurred in the course of treatment; or (3) a surgical procedure was performed on the wrong patient or the wrong organ, limb or part of the patient's body. Except as otherwise provided herein, there shall be no inference or presumption of negligence on the part of a health care provider." 18 *Del.C.* § 6853.

**16.** The Russells would have been entitled to a new trial only if a majority of the panel had found in their favor. A majority panel opinion that Dr. Kanaga *was* negligent would have precluded the granting of Dr. Kanaga's motion for a directed verdict, even in the absence of expert testimony to that effect, according to the Act. 18 *Del.C.* § 6853. In this case, however, if the Panel opinion had been admitted into evidence, the majority view would have constituted *prima facie* evidence that Dr. Kanaga *was not* negligent.

of entering a judgment in favor of Dr. Kanaga, based upon her motion for a directed verdict.

## ON MOTION FOR REARGUMENT AND REHEARING EN BANC

Before CHRISTIE, C.J., HORSEY and HOLLAND, JJ., and HARTNETT, Vice Chancellor.

This 12th day of March, 1990, the Court has before it the Russells' motion for reargument and for rehearing *en banc*. The Russells have requested that we reconsider our holding in this case, in view of our holding in *Strauss v. Biggs*, Del.Supr., 525 A.2d 992 (1987). Specifically, the Russells suggest that the "inferences" permitted in *Strauss* support their position in this appeal.

In *Strauss*, the patient, Mrs. Biggs, originally consulted the defendant, Dr. Strauss, because of a "pebble-like" pain in her right heel. *Strauss v. Biggs*, 525 A.2d at 994. Dr. Strauss concluded that Mrs. Biggs was suffering from heel spurs. *Id.* Dr. Strauss advised Mrs. Biggs that an outpatient surgical procedure, called a fasciotomy, would relieve her pain. *Id.*

On a later date, Mrs. Biggs returned to Dr. Strauss' office to have the fasciotomy performed. *Id.* She was prepared for surgery and a local anesthetic was administered. *Id.* According to Mrs. Biggs, seconds after Dr. Strauss made an incision, she experienced excruciating pain which caused her to scream. *Id.* Dr. Strauss immediately withdrew the scalpel. *Id.* When Dr. Strauss inserted the scalpel into Mrs. Biggs' foot a second time, she again felt excruciating pain. *Id.* Dr. Strauss stopped operating on Mrs. Biggs' foot within seconds of her second scream. *Id.*

Following the operative procedure, Mrs. Biggs returned to see Dr. Strauss on several occasions, each time complaining of the continuation of her original pain and a severe "new" pain. *Id.* Dr. Strauss told Mrs. Biggs that there was nothing else he could do, and suggested that she find another physician. *Id.* at 995. Thereafter, Mrs. Biggs consulted Dr. Centrella. *Id.* Dr. Centrella concluded that a fasciotomy had not been performed by Dr. Strauss, that Mrs. Biggs was still suffering from heel spurs, and that she was also suffering from damage to her lateral plantar nerve. *Id.*

Mrs. Biggs filed a lawsuit against Dr. Strauss alleging medical malpractice. One of the questions raised on appeal in *Strauss* was whether Dr. Strauss' negligence in failing to perform a fasciotomy was the cause of the continuation of the original pain in Mrs. Biggs right heel, until the fasciotomy was eventually performed by a different physician. Our opinion reflects that, at trial, Mrs. Biggs presented direct expert medical testimony that Dr. Strauss' failure to perform a fasciotomy was negligence. *Id.* Mrs. Strauss also presented direct expert medical testimony, at trial, that once a fasciotomy was performed, by another physician, the original pebble-like pain in her heel was eliminated. *Id.*

Our opinion in *Strauss* did suggest that the jury could "infer" a correlation between Dr. Strauss' negligence and the continuation of the painful symptoms in Mrs. Biggs' right heel. *Strauss v. Biggs*, 525 A.2d at 997.[17] However, the record reflects the "inference" was in reality a syllogism which was based upon the direct medical testimony of negligence, i.e., 1) Dr. Strauss was negligent in not performing a fasciotomy, 2) the pain in Mrs. Biggs' heel was eliminated when the fasciotomy was performed by another physician, and 3) therefore, the negligence of Dr. Strauss, in

17. We stated, in part:

With respect to causation, Dr. Centrella described the discomfort caused by a heel spur. The jury could readily infer that the failure to make a referral for proper treatment prolonged Mrs. Biggs' discomfort. Although direct testimony linking the alleged negligence to the prolonging of discomfort would have been helpful, under the circumstances of this case *the expert testimony was sufficient to allow this claim to go to the jury.*
*Strauss v. Biggs*, 525 A.2d at 997 (emphasis added). Later, in our opinion in *Strauss*, we concluded that "[t]he expert testimony suggested that the failure to perform [the fasciotomy] prolonged Mrs. Biggs' discomfort." *Id.* at 997–98.

not performing the fasciotomy, caused Mrs. Biggs' pain to continue.

In *Strauss*, another question presented on appeal was whether Dr. Strauss' negligence was the cause of the separate and independent new pain experienced by Mrs. Biggs. *Strauss v. Biggs*, 525 A.2d at 996. In her complaint, Mrs. Biggs alleged that her lateral plantar nerve was injured by Dr. Strauss. It was unnecessary for Mrs. Biggs to present expert medical testimony that Dr. Strauss was negligent in causing the injury to her lateral plantar nerve, because Dr. Strauss admitted that he was negligent in lacerating that nerve with a scalpel.

Our decision in *Strauss* concluded that Dr. Strauss' admission that his negligence caused the injury to Mrs. Biggs' lateral plantar nerve, and the other expert medical testimony presented, supported a finding by the jury that his negligence caused the new continuing pain which began when Mrs. Biggs first screamed. *Id.* at 998.[18] Once again, the direct admission of medical negligence by Dr. Strauss provided the major premise for a second syllogism, i.e., 1) Dr. Strauss negligently lacerated Mrs. Biggs' lateral plantar nerve, 2) Mrs. Biggs experienced pain at the nerve site immediately following the laceration, which continued until it was "alleviated" by corrective surgery, and 3) therefore, the negligent laceration by Dr. Strauss was the cause of the new pain.

In the Russells' case, there was neither expert medical testimony nor an admission that anything Dr. Kanaga did was negligent. Nevertheless, Mrs. Russell argues that because she did not have a pain prior to the operative procedure performed by Dr. Kanaga and did have a pain after the procedure, negligence can be inferred from the pain, and once negligence is inferred, it is also possible to infer that negligence was

the cause of the pain. Mrs. Russell's argument is circuitous. Mrs. Russell's argument fails as a permissible syllogism, in the absence of a major premise which is based upon an establishment of negligence, pursuant to the Delaware Medical Malpractice statute.

In *Strauss*, this Court recognized that the medical malpractice statute requires expert testimony concerning negligence (deviation from the standard of care) *and* causation. *Id.* at 997; 18 *Del.C.* § 6853. We then stated that "we find the expert medical testimony was sufficient to satisfy § 6853" as to all of the claims for medical malpractice presented by Mrs. Biggs. *Strauss v. Biggs*, 525 A.2d at 997. Thereafter, our opinion in *Strauss* held that, with respect to some of the malpractice claims which Mrs. Biggs presented, causation was subsumed within the direct medical expert testimony or admission concerning negligence.

Our decision in the Russells' case is a reaffirmation of the principle that, as a matter of law, the Delaware Medical Malpractice statute requires direct expert medical testimony to support a jury's finding of negligence and causation.[19] 18 *Del.C.* § 6853. Since the Russells failed to introduce direct expert medical testimony establishing negligence, a directed verdict should have been entered in favor of Dr. Kanaga. The motions for reargument and rehearing *en banc* are DENIED.

---

18. In *Strauss*, we stated, in part:
    While there was no expert testimony explicitly stating that the failure to inform Mrs. Biggs of the possibility of nerve injury delayed appropriate treatment and prolonged at least one of her symptoms, that fact could readily be inferred *from the expert testimony which was before the jury.*

*Strauss v. Biggs*, 525 A.2d at 998 (emphasis added).

19. Alternatively, a plaintiff can establish negligence by proving the applicability of an exception to the requirement for expert testimony, which is recognized in the statute.