Ronald J. STRAUSS, Defendant Below, Appellant,

v.

Rose Marie BIGGS, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 13, 1986.
Decided: May 18, 1987.

Alene S. Berkowitz of Berkowitz, Greenstein, Schagrin & Coonin, P.A., Wilmington, for appellant.

Charles Brandt, Wilmington, for appellee.

Before CHRISTIE, C.J., and HORSEY and MOORE, JJ.

**CHRISTIE, Chief Justice:**

This is an appeal from a judgment entered in Superior Court on a jury verdict awarding $300,000 in compensatory damages and $235,000 in punitive damages to a victim of podiatric medical malpractice, plaintiff (now appellee) Rose Marie Biggs. The defendant, Ronald J. Strauss (now appellant),[1] conceded prior to trial that he was liable for compensatory damages on account of a misplaced surgical incision which damaged a nerve in Mrs. Biggs' right foot. However, during the trial the plaintiff contended that Dr. Strauss committed additional acts of negligence throughout the course of her treatment and argued that in view of the totality of the circumstances his conduct as a whole was wilful or wanton, warranting punitive damages.

Appellant contends that the trial court erred in submitting five additional claims of negligence to the jury and further abused its discretion in admitting certain evidence. Therefore, appellant seeks a new trial or a remittitur as to punitive damages. For the reasons explained below, we find no error or abuse of discretion in the rulings of the trial court and affirm its judgment.

## I.

Mrs. Biggs first consulted Dr. Strauss on October 9, 1979, and complained of a "peb-ble-like" feeling in the heel of her right foot. Dr. Strauss concluded that she was suffering from heel spurs, an unnatural formation of excess bone on the bottom of the heel bone. He explained to her an outpatient surgical procedure called a fasciotomy, which involves cutting the fascia, a bundle of fibers that stretches taut across the bottom of the foot from the heel bone to bones near the toes. Dr. Strauss told her that cutting the fascia would relieve her pain.

At her next appointment, on October 23, Dr. Strauss took a medical history, discussed insurance coverage, and again explained to her the surgical procedure that he proposed to do. He also arranged for the surgery to be performed in his office on October 30.

Mrs. Biggs returned to Dr. Strauss' office between 9 and 10 p.m. on the night of October 30. She waited for several hours in a hallway outside of his waiting room along with other patients. Eventually, the patients in front of her were treated and left, and at approximately 1 a.m. in the morning of October 31, she was ushered into an operating room, prepared for surgery and administered a local anesthetic.

A short while later Dr. Strauss cut into Mrs. Biggs' foot. According to Mrs. Biggs' testimony at trial, the following occurred. Seconds after the incision, she experienced excruciating pain causing her to scream. Dr. Strauss denied hurting her and inserted the scalpel a second time. She screamed again and Dr. Strauss again denied hurting her. He then asked what it felt like, and she described the pain as "just like a burning knife going right up to my toes." Dr. Strauss then indicated that he was almost done, and he finished the process within seconds.

Mrs. Biggs saw Dr. Strauss for follow-up visits on November 2, 6, 13, and 30 and reported to him that she was experiencing great pain. During these appointments, Dr. Strauss never mentioned the possibility

---

1. Appellant, who was a licensed podiatrist at the time of the events in question, will be referred to hereinafter as "Dr. Strauss."

of nerve damage. He also never told her that he did not in fact perform the fasciotomy.[2] During her visit on November 30, Dr. Strauss told her that there was nothing more that he could do for her and that she ought to find another doctor. Mrs. Biggs testified that, when she asked him how she could find another doctor, he told her "the same way you found me."

Mrs. Biggs first saw Dr. Louis Centrella, a podiatrist, on January 11, 1980. Dr. Centrella found her to be in extreme pain and diagnosed that she was suffering from damage to her lateral plantar nerve as well as from heel spurs on the right heel. He explained his tentative diagnosis to Mrs. Biggs and referred her to a neurologist, Lanny Edelsohn, M.D., for tests to show the level of injury to the nerve. On January 23, Dr. Centrella arranged to perform surgery to correct the heel spurs, and on or about February 21, 1980, Mrs. Biggs was admitted to Riverside Hospital for that surgery. During surgery, Dr. Centrella saw that the fascia had not in fact been cut as Mrs. Biggs had been led to believe. Dr. Centrella's surgery alleviated the original "pebble-like" pain in Mrs. Biggs' heel. By March 19, 1980, her heel pain for which she was first treated was gone, although the severe nerve pain remained.

Meanwhile, Dr. Edelsohn attempted to treat the nerve pain with drugs. On one occasion, he had Mrs. Biggs hospitalized for three days for treatment. Unsatisfied with the results, Dr. Edelsohn referred Mrs. Biggs to Martin Gibbs, M.D., a neurosurgeon, who first examined her on June 19, 1980. Dr. Gibbs subsequently performed exploratory surgery following the scar left by Dr. Strauss' incision and confirmed that Dr. Strauss had damaged Mrs. Biggs' lateral plantar nerve. Dr. Gibbs did surgery nine months after Dr. Strauss' incision which relieved one of Mrs. Biggs' symptoms, a constant pounding that Mrs. Biggs described as "worse than any toothache I ever had in my life."

At trial, Dr. Gibbs described three types of pain resulting from nerve injury of the kind suffered by Mrs. Biggs. The first, the incisional pain caused by the actual cutting of the nerve, lasts a very short time. The second is that which comes from the formation of neuroma, or exposed nerve endings. This type of pain, which is described in more detail below, is essentially incurable. The third type of nerve pain is caused by sympathetic dystrophy, a secondary consequence of injury to the nerve. Sympathetic dystrophy causes a person to feel as if his foot is both burning and cold at the same time. These and other symptoms, including extreme sensitivity to touch, are caused by the bombarding of impulses from the loose fibers of the cut nerve to sympathetic nerves which are attached to blood vessels. The latter nerves are part of the sympathetic (or involuntary) nervous system.

Dr. Gibbs referred Mrs. Biggs to Dr. Taylor, a surgeon who performed an operation called a sympathectomy to relieve this third type of pain. An incision about a foot long was made across Mrs. Biggs' abdomen. The appropriate sympathetic nerve was severed, providing relief from the symptoms caused by sympathetic dystrophy.

Despite eventual relief from the third type of pain, Mrs. Biggs remains permanently disabled by the neuroma, or primary nerve injury. Both Dr. Gibbs and Dr. Centrella testified that she could never be gainfully employed. Dr. Gibbs testified that persons in her condition must remain house bound and should not walk for more than ten minutes at a time. According to these medical experts, Mrs. Biggs will have symptoms of constant burning, constant aching, electric shocks, cutting pain, stinging pain, and "pins and needles" pain for the rest of her life.

Defendant conceded liability for compensatory damages caused by his misplaced

---

**2.** Expert testimony admitted at trial indicated that the sound and feel of cutting the fascia is similar to that of cutting celery and that the completion of the cutting produces a distinct popping sound. There was also expert testimony that Dr. Strauss could not have performed a fasciotomy given the location of his incision. Plaintiff argued that Dr. Strauss must have known that he did not perform the procedure.

incision, but disputed any claim for punitive damages. In support of her punitive damages claim, plaintiff sought to show at trial that Dr. Strauss was motivated by greed, and that in his single-minded pursuit of profit he had acted with reckless indifference to Mrs. Biggs' well-being while she was under his care. As evidence of greed, plaintiff relied in part on the circumstances immediately surrounding the misplaced incision. For example, she showed that Dr. Strauss began work at 9 a.m. the previous morning and had a crowded schedule up until he attempted to operate on her at approximately 1 a.m.

Plaintiff's counsel also offered, over defendant's objection, evidence in an attempt to show that the motive of greed influenced the entire course of Dr. Strauss' treatment of Mrs. Biggs from his initial decision to perform a fasciotomy to his failure to inform her that he had not performed the procedure and had instead injured a nerve. For example, Dr. Strauss' records showed that the fasciotomy which he attempted to perform would provide only "some relief." Dr. Centrella testified that a fasciotomy would not completely relieve the "pebble-like" feeling caused by the heel spur and that the proper surgical procedure would have been a heel spur excision and fascietomy.[3] Evidence was also introduced to show that the fasciotomy cost $560, almost as much as the operation which would have provided complete relief ($610). Based on all this evidence, plaintiff argued that Dr. Strauss' proposed course of treatment was motivated by greed, and that he was recklessly indifferent to Mrs. Biggs' well-being in failing to refer her to a podiatrist who could have performed the correct operation.[4]

In support of the theory that Dr. Strauss was driven by greed, plaintiff also introduced, over defendant's objection, evidence which cast doubt on the propriety of bills sent by Dr. Strauss to Mrs. Biggs' medical insurer during the course of her treatment.

Upon being satisfied that plaintiff had established a *prima facie* case of punitive damages, the trial court permitted plaintiff to introduce evidence of defendant's wealth. Over the objection of the defendant, the plaintiff introduced, *inter alia*, evidence of defendant's 1983 gross salary and evidence that he held jointly with his wife several properties including two boardwalk condominiums.

At the close of the evidence, the trial court instructed the jury to assess compensatory damages pursuant to the conceded claim dealing with the misplaced incision and to consider whether defendant's conduct during the course of treatment, taken as a whole, warranted punitive as well as compensatory damages. In the context of the punitive damages charge, the court submitted five additional claims based on omissions during the course of treatment. These five additional claims concerned Dr. Strauss' alleged failure: (1) to treat Mrs. Biggs conservatively and to refer her to a podiatrist who could perform the appropriate procedure; (2) to perform the fasciotomy itself; (3) to stop the procedure after the first incision and to inform Mrs. Biggs that the incision might have involved a nerve; (4) to properly treat her after the unsuccessful surgery; and (5) to refer her to a neurologist or neurosurgeon after he knew or should have known of the nerve injury.

After the jury awarded $300,000 in compensatory damages and $235,000 in punitive damages, the defendant moved for a judgment notwithstanding the verdict and/or some combination of new trial and/or remittitur, as to both compensatory and punitive damages. By decision dated March 12, 1985, the trial court denied defendant's motion.

## II.

Appeals from a trial court's denial of a motion for new trial or for a remittitur are governed by a stringent "abuse of dis-

---

3. A fascietomy involves removal of the fascia; a fasciotomy, which Dr. Strauss attempted to perform, apparently involves cutting of the fascia without removal.

4. Dr. Strauss would not have been able to perform the heel spur excision and fascietomy because that operation must be done in a hospital. Dr. Strauss did not have hospital privileges.

cretion" standard of review. *See Eustice v. Rupert*, Del.Supr., 460 A.2d 507, 510–511 (1983) (motion for new trial); *Yankanwich v. Wharton*, Del.Supr., 460 A.2d 1326, 1332 (1983) (motion for remittitur). Where, as here, the appeal is grounded on allegations that the trial court erred as a matter of law or abused its discretion in submitting claims to the jury and in admitting certain evidence, the reviewing court will first consider whether the specific rulings at issue were correct. If the court finds error or abuse of discretion in the rulings, it must then determine whether the mistakes constituted "significant prejudice so as to have denied the appellant a fair trial." *Eustice*, 460 A.2d at 510. We will follow this approach by first considering whether any of the challenged rulings were in error or constituted abuse of discretion.

### III.

▮ Appellant contends that the trial court erred in submitting the five additional claims of negligence to the jury primarily because there was no expert testimony to show that the alleged omissions violated the applicable standard of care or that they resulted in injury to Mrs. Biggs. This argument is based on § 6853 of the 1976 Health Care Malpractice Insurance and Litigation Act, 18 *Del.C.* ch. 68, which provides that:

> No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case *and* as to the causation of the alleged personal injury.... (emphasis in original).

For the reasons stated below, we find the expert medical testimony was sufficient to satisfy § 6853 as to all five claims. We also reject appellant's contention that there was insufficient evidence to allow these claims to go to the jury on the issue of punitive damages.

The first additional claim concerned Dr. Strauss' alleged failure to treat conservatively Mrs. Biggs' right foot heel spur prior to surgery and to refer her for a heel spur excision. Appellant's challenge focuses on the failure to refer. Dr. Centrella testified that a fasciotomy might be appropriate in some circumstances but was "not ... indicated" in this particular case given the fact that Mrs. Biggs was suffering from a pebble-like feeling in the heel of her foot. Other comments that he made, which could be interpreted as indicating that Dr. Strauss' proposed treatment might have been legitimate, do not negate his clear testimony to the contrary.

With respect to causation, Dr. Centrella described the discomfort caused by a heel spur. The jury could readily infer that the failure to make a referral for proper treatment prolonged Mrs. Biggs' discomfort. Although direct testimony linking the alleged negligence to the prolonging of discomfort would have been helpful, under the circumstances of this case the expert testimony was sufficient to allow this claim to go to the jury.

In view of all the evidence including Dr. Strauss' notation that a fasciotomy would provide only "some relief," the failure to refer for more appropriate surgery also could be regarded as wanton conduct exhibiting a reckless indifference to the patient's best interests.

The second additional claim at trial concerned Dr. Strauss' failure to perform the fasciotomy itself. This claim is closely related to the contention, conceded by defendant at trial, that Dr. Strauss made an improper incision causing nerve injury. Dr. Strauss failed to perform the fasciotomy because he cut into Mrs. Biggs' foot in the wrong place. Yet the claims are distinct in that they caused different injuries. Whereas the misplaced incision caused nerve injury, the evidence indicated that the failure to perform the fasciotomy prolonged the original heel spur discomfort.

There was expert testimony indicating that Dr. Strauss' failure to perform the fasciotomy deviated from the applicable standard of care. Dr. Centrella testified that the fasciotomy could not have been performed from the place of Dr. Strauss' incision. The expert testimony suggested that the failure to perform prolonged Mrs.

Biggs' discomfort. There was also sufficient evidence overall to enable a reasonable jury to conclude that this omission was the product of a reckless indifference to the patient's well-being.

The third additional claim was that Dr. Strauss failed to stop the surgery after the first cut and to inform the patient of the probability that the surgery had involved a nerve. Appellant concedes that the jury could have believed Mrs. Biggs' testimony that Dr. Strauss inserted the scalpel a second time after she screamed in pain, and appellant acknowledges that he is liable for any additional pain caused by a second negligent incision. He argues, however, that there was no evidence that the second incision exhibited "wantonness." We believe that the trial judge correctly submitted this issue to the jury in view of all the attendant circumstances including the fact that Dr. Strauss' alleged second incision may have been in the same location of the incision which produced the first scream.

Appellant concedes that the failure to inform Mrs. Biggs of the possibility that a nerve was involved was wrongful, but claims, again, that no expert testified that the act resulted in harm to Mrs. Biggs. There was ample expert testimony (in particular by Dr. Gibbs) regarding the three kinds of pain associated with nerve damage. Dr. Gibbs and Mrs. Biggs also testified that his surgery nine months after the misplaced incision alleviated the "pounding" sensation. While there was no expert testimony explicitly stating that the failure to inform Mrs. Biggs of the possibility of nerve injury delayed appropriate treatment and prolonged at least one of her symptoms, that fact could readily be inferred from the expert testimony which was before the jury.

For similar reasons, the fourth additional claim (involving Dr. Strauss' failure to properly treat appellee post-surgically and to disclose to her the likelihood of a surgi-

cal complication), and the fifth (involving Dr. Strauss' failure to refer the appellee to a neurologist or neurosurgeon) were also properly submitted to the jury as to both compensatory and punitive damages. There was expert testimony that these omissions violated the applicable standard of care. It could be reasonably inferred that the omissions prolonged some of Mrs. Biggs' painful symptoms as described in expert testimony. There was also evidence that the omissions were wilful or wanton in that they occurred despite Dr. Strauss' knowledge of the pain which appellee was suffering.[5]

## IV.

Appellant also claims that the trial court erred in admitting evidence that Dr. Strauss billed Mrs. Biggs' medical insurer for procedures that were either unnecessary or which may not have been done. The evidence admitted suggested that: (1) Dr. Strauss billed Mrs. Biggs' insurer for a steroid injection which was never reported in his notes; (2) he took and billed for unnecessary x-rays on October 31 and November 30, 1979; (3) he billed the insurer for the fasciotomy that he did not perform; (4) he filed reports falsely stating that the surgery had been performed and that Mrs. Biggs' foot was undergoing "normal post-surgical healing;" and (5) he billed for a posterior fibial nerve block which might not have been performed. Appellant argues that this evidence does not bear on the issue of whether or not Dr. Strauss displayed a wilful or wanton attitude in his treatment of Mrs. Biggs.

The decision to admit testimony as relevant is generally within the sound discretion of the trial judge and will not be reversed absent a clear abuse of that discretion. *Lampkins v. State*, Del.Supr., 465 A.2d 785 (1983). However, appellant characterizes this issue as one involving the "erroneous formulation of applicable law"

5. Because we find that the five additional claims were properly submitted to the jury as to both compensatory and punitive damages, we need not address appellant's argument that the evidence which supported these claims was not relevant to Dr. Strauss' state of mind when he made the misplaced incision for which he conceded liability. *Cf.* the following discussion in Part IV.

and urges us to rule as a matter of law that evidence of conduct which is not directed at the plaintiff, and does not give rise to the injury complained of, is irrelevant as to the punitive damages issue.

In *Jardel Co., Inc., and Robbins Co., Inc., v. Hughes,* Del.Supr., 523 A.2d 518 (1987), this Court emphasized the importance of the defendant's state of mind in summarizing the principles of the law of punitive damages. "Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Id.* at 529 (quoting *Restatement (Second) of Torts,* § 908 (1979)). Conduct is "outrageous" because of "evil motive or reckless indifference to the rights of others." *Id.* at 529 (quoting *Restatement (Second) of Torts* § 908, comment b (1979)). The wilful or wanton standard necessary to justify imposition of punitive damages refers to "a distinct state of mind, one a conscious awareness, the other a conscious indifference." *Id.* at 529. Thus, state of mind is a "vital" element in punitive damages. *Id.* at 530.

As critical as state of mind is to the imposition of punitive damages, a plaintiff can only rarely present direct evidence—such as the defendant's own statement—concerning the defendant's state of mind at the time of the conduct in question. In many cases the tortious conduct itself, and the circumstances immediately surrounding it, warrant an inference of a wilful or wanton attitude. In *Riegel v. Aastad,* Del. Supr., 272 A.2d 715 (1970), for example, the defendant drove a top-heavy truck around a series of curves in the road at night, at twice the speed limit, and with the knowledge that the truck would not "corner" as well as an automobile. This Court held that the evidence was sufficient to establish a jury question as to whether the defendant's conduct was in wilful or wanton disregard of plaintiff's rights. And in *Walczak v. Healy,* Del.Super., 280 A.2d 728 (1971), the court awarded punitive damages where the defendant, who had been drinking and speeding, drove his car on the wrong side of the road resulting in a head-on collision with plaintiff's vehicle.

■ Reckless indifference also may be inferred from evidence of the defendant's prior behavior toward persons not the eventual plaintiff. The Court approved the use of such evidence in *Cloroben Chemical Corp. v. Comegys,* Del.Supr., 464 A.2d 887 (1983). In affirming an award of punitive damages against a chemical company for the unsafe distribution of an inherently dangerous drain cleaner which burned the plaintiffs, the Court noted that there was evidence that the company had sold the cleaner with full knowledge that it had caused a number of injuries, and that it was aware that the product and the package were unsafe yet continued to package the product in the same manner. *Id.,* at 891–892. This evidence, which involved complaints by other customers, warranted a finding of reckless indifference in selling the product which injured the plaintiffs.

■ Evidence of a doctor's fraudulent billing practices against a third party such as a patient's medical insurer does not necessarily have an important bearing on the doctor's state of mind during his treatment of the patient. We agree with appellant that a doctor who appears to have overcharged an insurer may nonetheless be very caring in administering medical treatment. However, neither is this evidence of greed necessarily irrelevant to a doctor's attitude toward treatment of his patients during the same period of time. Relevance hinges on whether the plaintiff can plausibly link the two.

Appellee's theory of this case at trial was that Dr. Strauss was so driven by greed that he acted with reckless indifference to her well-being. If the only evidence supporting this theory were Dr. Strauss' billing practices *vis-a-vis* her medical insurer, we would agree that the relevance of each billing to Dr. Strauss' treatment of Mrs. Biggs had not been adequately established. However, appellee buttressed this theory with other substantial evidence which suggested that greed did influence Dr. Strauss' treatment of her. The evidence

concerning Dr. Strauss' scheduling and his attempt to operate on her at 1 a.m. after having been working since 9 a.m. the previous morning, is one example. Another example is the evidence that Dr. Strauss proposed to perform an operation which would only provide partial relief, when he knew or should have known that a different operation, which he was not able to perform, was medically indicated. In view of the substantial independent evidence supporting appellee's theory that Dr. Strauss was motivated by greed, we conclude that the trial court did not abuse its discretion in finding the evidence relating to Dr. Strauss' billing of Mrs. Biggs' medical insurer relevant to his state of mind during his allegedly negligent treatment.

### V.

Appellant's final contention is that he is entitled to a new trial or remittitur on the issue of punitive damages because the jury was permitted to consider inadmissible evidence bearing on his financial condition. Specifically, appellant objects to the admission of: (1) evidence that he owned three luxury automobiles without any indication of their net equity value; (2) evidence of investment properties (including two Atlantic City boardwalk condominiums) held by defendant jointly with his wife, without evidence of their net equity value; (3) evidence pertaining to value of the corporate pension plan in which approximately ten other employees had a vested interest; (4) evidence of the 1983 gross receipts of his professional corporation; and (5) his 1983 gross salary of $537,682.00.

 Punitive damages are intended to serve a dual purpose—to punish the wrongdoer and to deter him and others from similar conduct. *See Jardel,* 523 A.2d at 529. Evidence of the defendant's wealth is admissible to enable the jury to assess a penalty which will appropriately punish and deter, since "the degree of punishment or deterrence resulting from a judgment is to some extent in proportion to the means of the guilty person." *Restatement (Second) of Torts* § 908, comment e (1979); *See also Bryan v. Thos. Best & Sons, Inc.,* Del.Super., 453 A.2d 107, 108 (1982).

 Appellant objects to the introduction of this evidence on the ground that it "inflated the wealth considered by the jury in assessing punitive damages." However, the trial court in deciding to admit the evidence stressed that Dr. Strauss would have the opportunity to explain to the jury why his assets were not as great as they might appear to be. Under these circumstances, admission of this evidence without proof of its net value to defendant was not an abuse of discretion. *Cf. Belinski v. Goodman,* N.J. Super., App.Div., 139 N.J. Super. 351, 354 A.2d 92, 95 (1976) (exaggerated remarks in plaintiff's counsel's summation regarding defendant's wealth did not warrant a new trial in part because the jury had financial statements indicating defendant's net worth).

Appellant also argues that under the circumstances of this case, where an underlying greed motive was alleged, the trial court should have minimized, to the extent possible, the danger that this evidence would unfairly influence the jury. Under the federal counterpart to Rule 403 of the Delaware Rules of Evidence, courts have considered the possibility of a less prejudicial alternative to a challenged piece of evidence in balancing the probity of the evidence against the danger of unfair prejudice. *See* Saltzburg & Redden, *Federal Rules of Evidence Manual,* 144 (4th ed. 1986); and *Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir.1983). However, in light of the fact that Dr. Strauss was given an opportunity to explain his actual financial situation, we cannot say that the danger of unfair prejudice was so great as to render the admission of the evidence an abuse of discretion.

 We also reject appellant's claim that he is entitled to remittitur as to punitive damages. The trial court summarized the evidence supporting the imposition of the penalty in the following language:

If the jury believed the overwhelming evidence presented in behalf of the plaintiff, they could believe among other things that the [defendant] was operating a "podiatric mill" in the most pejorative sense the phrase would contemplate; that he was motivated more by money than by the medical/ethical standards of

his profession; that he fell ... far short of the professional mark in his effort to perform a fasciotomy; and that he attempted to cover up his actions thereby attempting to avoid being caught for his negligent conduct and thereby protracting unnecessarily the plaintiff's pain and suffering before she was able to be put in the hands of a specialist who would provide appropriate medical care.

In light of all the evidence, the verdict of $235,000 in punitive damages is warranted. It did not shock the conscience of the trial court, and it does not shock the conscience of this Court. *Cf. Riegal v. Aastad*, Del. Supr., 272 A.2d 715 (1970).

\* \* \* \* \* \*

Having found no error or abuse of discretion in any of the challenged rulings, we rule that the Superior Court did not abuse its discretion in denying appellant's motion for a new trial or for remittitur as to punitive damages and we affirm the judgment of that court.