**Lesher v. Nichter**

*Barton A. Haines,* for plaintiffs.
*Maureen A. Gallagher,* for defendant.

DOWLING, *J.,* September 9, 1992—

We have in the past rather consistently expressed our dispiriting approach to the concept of punitive damages and its trivialization. See *In re Dauphin County Asbestos Cases,* 109 Dauphin Leg. J. 175 (1989); *Wolgemuth, et al. v. Hershey Medical Center & Harrisburg Hospital,* 111 Dauphin Leg. J. 353 (1992); *Pinskey, et al. v. Harristown Development Corp., et al.,* 110 Dauphin Leg. J. 281 (1990); *Chambers v. Domino's Pizza,* 110 Dauphin Leg. J. 1 (1989); and *Estate of Bair v. Hunters & Anglers Assn.,* 110 Dauphin Leg. J. 57 (1989).

But there are exceptions to what might be codified as the general rule against their allowance. Contrary to that most fatuous of proverbs—exceptions do not prove the rule. Clearly, an exception can never prove a rule. On the contrary, it disproves it. Originally, the expression made sense, because prove was used in its old-fashioned meaning, "test" (Latin probo, "I test") from which both probo and probate derive. And, true enough, an exception does test the rule. "Proves" in "the exception proves the rule" is what scholars call a linguistic fossil—that is, the survival of an older meaning or form because it is preserved, like a fly in amber by the surrounding context. Sir Arthur Conan Doyle was not taken in: in "The Sign of The Four," he has Sherlock Holmes say to Dr. Watson, "I never make exceptions. An exception disproves the rule."

While in Pennsylvania punitive damages are available only for outrageous conduct or conduct that evidences the defendant's evil motive *or* reckless indifference to the rights of others, it is our conclusion that under the *facts pleaded* in the complaint, plaintiffs have established

a prima facie claim for punitive damages against Dr. Charles A. Nichter; and hence, the demurrer filed by this defendant on behalf of all defendants in Count II of the complaint is dismissed.

In a detailed 85-paragraph complaint, the sad history of this case is set forth. According to the pleading, Jeffrey Lesher Jr., who was born May 23, 1983, first came under the care of Dr. Charles A. Nichter in June of 1986. Dr. Nichter noted, among other things, Jeffrey's failure to thrive associated with difficulties with infections if not properly treated. In the fall of 1987, the boy was referred to the feeding clinic of the Elizabethtown Hospital & Rehabilitation Center because of the child's severe weight-loss over the last six months. At this time Dr. Nichter became Jeffrey's treating physician. The child's mother, Sherry Lesher, informed him that the boy was having a problem keeping food down and seemed uncomfortable during feedings. Dr. Nichter noted the possibility of a problem with reflux (the physical inability to keep food in the stomach), but instead of further clarifying this situation, attempted to treat his problem as a psychological one, namely, a behavioristic feeding disorder. There was no improvement, and Mrs. Lesher repeatedly informed Dr. Nichter and the members of the feeding clinic that her child was still having problems swallowing and that food kept coming back into his throat creating a gurgling sound. On July 22, 1988, some nine months after the initial visit to the feeding clinic, Dr. Nichter referred Jeffrey to defendant Milton S. Hershey Medical Center for a barium swallow at which time four episodes of gastroesophageal reflux were observed. Jeffrey's condition continued to deteriorate and he was losing weight and be-

coming debilitated. He was then referred by Dr. Nichter to defendant Thomas V.N. Ballantine, M.D., on December 27, 1988, for evaluation for Nissen fundoplication surgery and gastrostomy tube insertion. It was thought that this process would control the reflux and allow tube feeding in place of oral feeding. On January 30, 1989, Jeffrey underwent surgery, and a gastrostomy tube was placed in his stomach. It seems that he was transferred back and forth from the Hershey Medical Center to the Elizabethtown Hospital until April 21, 1989, when he was discharged. Then Dr. Nichter decided that the gastrostomy tube should be converted to a Bard gastrostomy button which, in June of 1989, was inserted in the gastrostomy site. It alleged that the button was of the wrong size and did not function properly. Some months later in December of 1989, the child was taken to the Elizabethtown Hospital, and the initial button was replaced with another. Despite this, Jeffrey's condition continued to deteriorate. Finally, on January 23, 1990, he became so ill that his mother had trouble waking him and when she did he was gagging, wretching, vomiting, had a fever and distended stomach. She called Dr. Nichter and informed him of Jeffrey's symptoms who told her that it was probably "the flu." The same day the mother took the child to the family physician who immediately instructed her to take him to the emergency room of the Good Samaritan Hospital where she was there told to go directly to the Milton Hershey Hospital. There it was found that the child had free intra-abdominal air, and an exploratory laparotomy was immediately performed. On February 6, 1990, a second exploratory laparotomy was performed because the boy's condition was

deteriorating. At this time, another perforation of the stomach was located as well as a perforation of the small bowel. Jeffrey's condition continued to go down hill, and on March 1, 1990, he expired.

Paragraphs 54 and 56 of the complaint detail the alleged negligence of defendant Dr. Charles A. Nichter:

"(54) At all times relevant to this lawsuit, the defendant, Charles A. Nichter, M.D., individually and/or by and through his agents, servants, workmen and employees, acting within the course and scope of their employment breached and violated the aforesaid duties owed to the plaintiffs in some or all of the following particulars:

"(a) failing to expeditiously refer Jeffrey for the proper treatment for the gastroesophageal reflux which he exhibited from the time of his initial visit to the feeding clinic;

"(b) delaying the proper treatment of Jeffrey A. Lesher Jr., for his failure to thrive;

"(c) failing to treat Jeffrey for his deteriorating condition;

"(d) belatedly referring Jeffrey for a barium swallow to confirm the presence of the reflux;

"(e) failing to promptly and properly treat Jeffrey when he received the results of the barium swallow;

"(f) belatedly referring Jeffrey for Nissen fundoplication surgery and gastrostomy tube insertion;

"(g) failing to formulate a rational comprehensive plan for nutritional implementation by gastrostomy feeding;

"(h) enlarging the size of the gastrostomy tube to a no. 26, which is incompatible with the no. 24 button, thus causing leakage and infection to occur;

"(i) negligently recommending insertion of the Bard gastrostomy button in Jeffrey A. Lesher Jr., who clearly was not a candidate;

"(j) arranging for the original insertion of the gastrostomy button;

"(k) arranging for the insertion of the second gastrostomy button before determining what was causing the leakage to occur in the first button;

"(l) failing to investigate Mrs. Lesher's concerns regarding Jeffrey's deteriorating condition as well as the usefulness and appropriateness of the button;

"(m) failing to detect and diagnose the perforations sustained by Jeffrey as a result of the insertion of these buttons;

"(n) failing to promptly treat Jeffrey for the perforations he sustained as a result of the insertion of these buttons....

"(56) The conduct of the defendant, Charles A. Nichter, M.D., as aforesaid, acting individually and/or by and through his agents, servants, workmen and/or employees, acting within the course and scope of their employment, constitutes gross negligence and a willful and wanton misconduct amounting to a reckless disregard for the health, safety and welfare of the deceased-plaintiff, Jeffrey A. Lesher Jr., in some or all of the following particulars:

"(a) delaying in the treatment of Jeffrey's gastroesophageal reflux for 14 months which he knew about from

the time Jeffrey presented to the feeding clinic with the reflux on his initial visit in October of 1987;

"(b) failing to investigate Mrs. Lesher's concerns regarding Jeffrey's deteriorating condition, when he knew that Jeffrey was more prone to infection if his failure to thrive was not attended to promptly;

"(c) recommending, instrumenting and allowing the insertion of a second gastrostomy button in a child when he had actual knowledge that the first one was not working and without first investigating the problem;

"(d) failing to properly treat Jeffrey's deteriorating condition when he knew that Jeffrey was gagging, retching, vomiting, with a fever and distended stomach on January 23, 1990."

We thus have a situation remembering, of course, that on a demurrer we must accept as verity all well-pleaded facts and all reasonable inferences deductible from them, where Dr. Nichter was informed in October of 1987 that the child had difficulty keeping food down, and in fact noted a possible reflux problem, but chose to treat the situation as a behavioristic feeding disorder. He was repeatedly informed that the boy was still having problems swallowing and food kept coming back into his throat; yet it was not until some nine months after his initial visit to the feeding clinic in July of 1988 that Nichter finally referred Jeffrey to Hershey Medical Center for a barium swallow to clarify the gastroesophageal reflux. More months elapsed, and not until January of 1989 was surgery performed and a tube inserted. Months after this, with the child not improving, it was determined that a gastrostomy button be inserted. Four more months

followed when it was decided that the wrong size button was used. All of this has been detailed above, and there is no need to repeat it except to point out that according to the allegations the doctor was constantly informed of the boy's deteriorating condition. Considering the measures taken and the time which elapsed, it could be a reasonable inference if these facts are established at trial, that Dr. Nichter's conduct was such that he was recklessly indifferent to the child's condition.

A 3rd Circuit decision applying Pennsylvania law is informative on what constitutes "reckless indifference." In *Medvecz v. Choi,* 569 Fed.2d 1221 (1977), the court held that the jury should have been permitted to decide if defendant doctor's conduct merited an award of punitive damages. Focusing on the meaning of reckless indifference to the rights of others, the court noted:

"(4) The Restatement, in discussing the standard for the award of punitive damages makes no exception for medical malpractice cases. Indeed, one court has specifically declared that '[t]here would appear to be no rational justification for any separate rule or language applicable to the medical profession.' *Noe v. Kaiser Foundation Hospitals,* 248 Or. 420, 435 P.2d 306, 308 (1967). The question in medical malpractice cases, as in tort actions generally, is whether there has been sufficiently aggravated conduct contrary to the plaintiffs' interests, involving bad motive or reckless indifference, to justify the special sanction of punitive damages. That sanction serves the dual function of penalizing past conduct constituting an aggravated violation of another's interests, and of deterring such behavior in the future."

*Los Alamos Medical Center v. Coe,* 58 N.M. 686, 275 P.2d 175 (1954), while factually inapposite, does con-

tain the relevant observation in referring to the possibility of morphine addiction and the doctor's assurance that the pain was so severe it would counteract the effects of the morphine, "He was thus put on notice, but remained indifferent as to the harmful results which followed. We think this evidence was sufficient to take that issue to the jury." 275 P.2d at 178.

*Dill v. Miles*, 181 Kan. 350, 310 P.2d 869 (1957), reversed a lower court's sustained demurrer on punitive damages on the following facts:

"Plaintiff, after consultation with defendant regarding diagnosis and treatment of a condition known as thrombophlebitis in the lower calf of his left leg, was advised to and did enter a hospital, where defendant attempted to perform an aortogram on plaintiff's body. Upon regaining consciousness from the general anesthetic, plaintiff was informed by defendant that the aortogram had not been performed, that the aorta had not been located or penetrated, and that nothing had been accomplished in the operating room to aid defendant in examining, diagnosing or determining the nature and extent of plaintiff's ailment. Plaintiff further states that immediately upon regaining consciousness he began experiencing extreme, excruciating and nauseous pain, and paralytic sensations in the lower extremities of his body from the first lumbar to his toes, accompanied by a paralysis of his bladder and inability to void. Although he asked defendant for diagnosis, relief and treatment of these conditions, defendant did nothing whatsoever. Plaintiff's condition grew progressively worse in the next 72 hours, but defendant still did nothing to diagnose, relieve or treat such illness, did not advise plaintiff of the seriousness

of his condition, did not advise calling in another physician and surgeon, and finally withdrew from the case."

The *Dill* court held that these facts were sufficient to show defendant's conscious conduct indicated a reckless disregard and complete indifference and unconcern for the probable consequence of his alleged wrongful acts and were sufficient to charge him with wanton negligence upon which plaintiff could predicate a cause of action for punitive damages.

*Strause v. Biggs,* 525 A.2d 992 (1987 Delaware), was a podiatric medical malpractice action where the court on evidence indicating the defendant doctor had failed to perform the proper operation and, in fact, had made an improper incision causing permanent nerve injury as well as noting in his record that the operation contemplated would only provide some relief, held that the failure to provide for more appropriate surgery could be regarded as wanton conduct exhibiting a reckless indifference to the patient's best interests. A punitive damage award of $235,000 was upheld (compensatory damages awarded of $300,000 were awarded). See also, *Azarbal v. Medical Center of Delaware Inc.,* 724 F. Supp. 279 (Del. 1989).

The situation with respect to the Elizabethtown Hospital & Rehabilitation Center is somewhat different. While the complainant alleges both direct and vicarious liability, careful reading of the allegations:

"(a) permitting defendant doctors and feeding clinic to treat patients with physiologic feeding disorders such as Jeffrey A. Lesher Jr., at defendant, hospital because they did not possess the requisite degree of skill, care, training or experience to be able to render that quality

of care necessary to safeguard the life and well being of such patients:

"(b) permitting, defendant, Charles A. Nichter, M.D., to treat patients with physiologic feeding disorders, such as Jeffrey A. Lesher Jr., because he did not possess the requisite degree of skill, care, training or experience necessary to render that quality of care necessary to safe guard the life and well being of such patients:

"(c) failing to supervise the defendant doctors and feeding clinic that they were not attempting to treat a patient with physiologic feeding disorders and in particular spending approximately 14 months treating Jeffrey while his condition continued to deteriorate...."

This leads to the conclusion that basically the action is bottomed on theory of respondeat superior and a lack of proper supervision of Dr. Nichter's conduct. While this clearly alleges a basis for negligence, we do not feel such averments rise to the requisite "reckless indifference" required. The mental attitude necessary is, in a sense, one step removed from the plaintiffs; and this partial insulation tips the scales against allowing punitive damages.

Accordingly, we enter the following

ORDER

And now, September 10, 1992, the preliminary objection of defendant Charles A. Nichter to strike Count II is denied; and the preliminary objection of defendant Elizabethtown Hospital & Rehabilitation Center to strike Count V is granted, and said count is stricken.