Scott O'RILEY, Plaintiff
Below, Appellant,

v.

Shawn ROGERS, Defendant
Below, Appellee.

No. 444, 2012.

Supreme Court of Delaware.

Submitted: April 3, 2013.
Decided: June 19, 2013.

Edward C. Gill, Law Office of Edward C. Gill, P.A., Georgetown, Delaware for appellant.

Mary E. Sherlock, Weber, Gallagher, Simpson, Stapleton, Fires & Newby, LLP, Dover, Delaware for appellee.

Before STEELE, Chief Justice, JACOBS and RIDGELY, Justices.

STEELE, Chief Justice.

In this personal injury action, a Superior Court judge *sua sponte* excluded a medical expert witness's testimony that it was possible that the plaintiff's permanent injury might improve depending on the results of further recommended testing. After the jury awarded the plaintiff $292,330, the defendant moved for a new trial. The trial judge granted the motion because he concluded that while medical experts must offer opinions with a reasonable degree of medical certainty, the disputed testimony addressed the expert opinion's depth and credibility. In the second trial, the jury heard the testimony and returned a $7500 verdict. Plaintiff appeals the judge's decision to grant a new trial. Because the Superior Court judge properly excluded the testimony initially, we hold that he abused his discretion when he ordered a new trial. Accordingly, we VACATE the Superior Court's judgment ordering a new trial, all subsequent rulings, and the second jury verdict and REMAND with instructions to reinstate the original jury verdict.

## I. FACTUAL AND PROCEDURAL HISTORY

Defendant–Appellee Shawn Rogers's truck collided with Plaintiff–Appellant Scott O'Riley's truck on September 18, 2006. O'Riley injured his shoulder, elbow, hand, and neck in the collision. O'Riley's shoulder healed, but he continues to suffer from pain and numbness in his left elbow and hand. Dr. Paul Harriott, an orthopedic surgeon, treated O'Riley. Harriott recommended that O'Riley undergo an electromyography (EMG) examination because Harriott could not determine the source of O'Riley's radiating pain and numbness. O'Riley did not undergo the EMG test because he believed that he had exhausted his insurance benefits[1] and he

1. The trial judge determined that it was "not crystal clear" whether O'Riley had exhausted

did not have the money to cover the test's cost.

O'Riley sued Rogers in the Superior Court. Harriott testified by video deposition as the principal medical expert concerning O'Riley's injuries. As part of his testimony, Harriott opined that O'Riley suffered from permanent elbow and left hand injuries. However, Harriott also testified that his permanency diagnosis would be more definitive if O'Riley underwent an EMG test.

On the first morning of the trial before jury selection, Rogers's counsel presented a motion in limine to exclude Harriott's testimony relating to whether O'Riley's injury was permanent. During the hearing on that motion, the result of which is not appealed, the Superior Court judge *sua sponte* questioned whether several of Rogers's counsel's crossexamination questions were proper. Ultimately, he ruled that crossexamination testimony must address reasonable medical *probabilities*, not *possibilities*.

Based on the trial judge's ruling, the parties agreed to strike certain portions of Harriott's testimony. The jury heard Harriott testify to the following during crossexamination:

Q And you recommended an EMG to evaluate his left elbow?

A Mostly for the nerve, the numbness in his hand, so to try to determine whether it was coming from his elbow or perhaps higher up from his neck.

Q Were you recommending the EMG so you could try to make a more definitive diagnosis?

A More definitive, and give him some possibility of definitive treatment, yeah.

Q And it looks like you did not see or evaluate Mr. O'Riley from July 21, 2008 until June 10, 2009, is that correct?

A That's correct.

Q And today, you are still recommending an EMG test, is that correct?

A Yeah, I think it's—you know, we can help individuals, sometimes you can't. But certainly an EMG test is a minimally invasive test, it can offer a lot of information, I still think it would be a good thing because possibly the idea would be maybe we can help with the numbness in his hand.

. . . .

Q Would the results of the EMG test govern your treatment protocol?

A It would help me proceed. It's hard to proceed any further. I mean that's why I was offering him therapy, because I don't think he could afford the EMG, so your hands are somewhat tied.

If the EMG was available to us, then we could see whether something more invasive like surgery might help him or, if that was unrevealing, maybe an MRI of the neck. So, again, not knowing, it limits how far we can take his care.

The parties agreed to strike the following testimony:

Q Okay. And is it possible, Doctor, that his symptoms may improve, depending on the treatment protocol?

A Very possibly right. So if the compression of his nerve that resulted in the numbness was from his elbow, you could move the nerve to a more favor-

his insurance benefits. *O'Riley v. Rogers,* 2011 WL 3908404, at *2 (Del.Super. Aug. 30, 2011). Because O'Riley relied on his counsel's advice that O'Riley had exhausted his benefits, the trial judge noted that the record could support a jury determination that O'Riley reasonably believed the insurance coverage was unavailable, which the jury would have considered when assessing whether to reduce damages for failure to mitigate. *Id.*

able location and perhaps the numbness would resolve. Or perhaps from his neck, and then it might require more invasive, you know, some sort of decompressive surgery at his neck.

So usually problems of numbness, you can tackle, unless it's a neuropathy ... or something like that, so I think at least you would do the work-up. So it's sort of frustrating, it's been frustrating for me not to be able to pursue this to the level of scrutiny that I'd like to.

Q So it's possible at least that the numbness and some of the subjective pain symptoms may not be permanent in nature, depending on future treatment protocol?

A It's possible, yes.

After trial, the jury returned a $292,330 verdict in O'Riley's favor. Rogers moved for a new trial, alleging that the trial judge prejudicially erred when he *sua sponte* struck portions of Harriott's testimony. On August 30, 2011, the Superior Court judge ordered a new trial on damages because he thought the excluded testimony impacted the jury's ability to measure the depth and credibility of Harriott's permanency opinion.[2]

We denied O'Riley's application for an Interlocutory Appeal.[3] The Superior Court judge presided over a second jury trial on the issue of damages, and that jury

heard the previously excluded testimony. On August 7, 2012, the second jury returned a $7500 verdict in O'Riley's favor. O'Riley now appeals the Superior Court judge's decision to grant the motion for a new trial.

## II. STANDARD OF REVIEW

■■■■ When a party appeals a final judgment, we may review an interlocutory order granting a new trial.[4] We review a trial judge's decision to grant a new trial for an abuse of discretion.[5] Where the parties allege the decision to grant or deny a new trial turned on whether the trial judge erred as a matter of law or abused his discretion when he made an evidentiary ruling, we conduct a two-part analysis.[6] First, we must consider whether the specific evidentiary rulings at issue were correct, and second, if we find error or abuse of discretion in the rulings, we "must then determine whether the mistakes constituted significant prejudice so as to have denied the appellant a fair trial."[7]

## III. ANALYSIS

■■■■ The Superior Court judge properly excluded portions of Harriott's testimony in his initial evidentiary ruling. A trial judge has a duty to make sure "that the rules of practice and evidence are applied ... with or without objection by

---

**2.** *Id.* at *3. The Superior Court judge reasoned that "[t]he permanent nature of the injuries was the critical element for this verdict," and therefore, the decision to exclude crossexamination questions testing the integrity of the principal medical expert's opinion prejudiced O'Riley. *Id.* at *1, *3.

**3.** *O'Riley v. Rogers,* 27 A.3d 552, 2011 WL 4383554, at *1 (Del. Sept. 21, 2011) (ORDER).

**4.** *Robinson v. Meding,* 163 A.2d 272, 275 (Del. 1960) (citations omitted) ("Generally, under modern statutes and modern rules, an appeal

from a final judgment brings up for review all interlocutory or intermediate orders involving the merits and necessarily affecting the final judgment which were made prior to its entry.").

**5.** *Barriocanal v. Gibbs,* 697 A.2d 1169, 1171 (Del.1997) (citing *Strauss v. Biggs,* 525 A.2d 992, 996–97 (Del.1987)).

**6.** *Id.* (citing *Strauss,* 525 A.2d at 997)

**7.** *Id.* (quoting *Strauss,* 525 A.2d at 997) (internal quotation marks omitted).

counsel."[8] Our case law is clear that "when an expert offers a medical opinion it should be stated in terms of 'a reasonable medical probability' or 'a reasonable medical certainty.'"[9] We do not limit this requirement to only the medical opinions an expert offers during his direct examination.[10]

█ A doctor cannot base his expert medical opinion on speculation or conjecture.[11] As we clearly stated in *Oxendine v. State*, "a doctor's testimony that a certain thing is possible is no evidence at all."[12] A doctor's opinion about "what is possible is no more valid than the jury's own speculation as to what is or is not possible."[13]

For example, we held in *Riegel v. Aastad* that a medical expert witness's testimony concerning "possible medical consequences, rather than ... reasonable medical probability" was impermissible speculation.[14] In *Rizzi v. Mason*, the defendant alleged that the plaintiff did not comply with a discovery request when she did not produce a letter from one of the plaintiff's previous doctors in which the doctor opined that, because of an earlier accident, the plaintiff "may" require surgery in the future.[15] The Superior Court judge noted that the doctor's "opinion as to the need for future surgery was not stated in terms of 'reasonable medical probability'" and was therefore inadmissible on that basis.[16] Similarly, in *Kardos v. Harrison*, counsel crossexamined a medical expert witness about whether earlier intervention would have increased the patient's chance of a better outcome; the expert witness testified that he would have to speculate to answer the question.[17] We affirmed the Superior Court judge's dismissal of the case "because the plaintiff's only evi-

8. *State Highway Dep't v. Buzzuto*, 264 A.2d 347, 351 (Del.1970) (citing *S. Atl. S.S. Co. of Del. v. Munkacsy*, 187 A. 600, 606 (Del.1936)).

9. *Floray v. State*, 720 A.2d 1132, 1136 (Del. 1998) (footnote omitted) (citations omitted).

10. *See Armstrong v. Minor*, 323 N.W.2d 127, 128 (S.D.1982) (citations omitted) ("Appellant contends that the trial court erred in sustaining objections to questions posed on crossexamination by appellant's counsel that would have limited [the medical expert's] opinion to the reasonable medical certainty standard. In view of our holding that [m]edical experts are qualified to express their opinions based upon medical certainty or medical probability, but not upon possibility, the trial court did not err in sustaining the objections to the questions in issue." (alteration in original) (internal quotation marks omitted)). We note that while the Wisconsin Supreme Court permits a defendant (but not a plaintiff) to offer medical proof only based on possibilities, *see Hernke v. N. Ins. Co. of N.Y.*, 20 Wis.2d 352, 122 N.W.2d 395, 399–400 (1963), we disagree and find that double standard inconsistent with our case law limiting expert medical opinion testimony to a reasonable medical probability standard without consideration for a litigant's status as plaintiff or defendant. *See Floray*, 720 A.2d at 1136 (citations omitted).

11. *Oxendine v. State*, 528 A.2d 870, 873 (Del. 1987) (citing *Riegel v. Aastad*, 272 A.2d 715, 718 (Del.1970)).

12. *Id.* (citing *Palace Bar, Inc. v. Fearnot*, 269 Ind. 405, 381 N.E.2d 858, 864 (1978)).

13. *Id.* (citing *Palace Bar*, 381 N.E.2d at 864).

14. *Riegel*, 272 A.2d at 718.

15. *Rizzi v. Mason*, 799 A.2d 1178, 1183 (Del.Super.2002).

16. *Id.* at 1184. She permitted testimony concerning the letter, however, while stressing it was otherwise inadmissible, in order to remedy the defendant's claim of prejudice stemming from the alleged discovery violation. *Id.*

17. *Kardos v. Harrison*, 980 A.2d 1014, 1018–19 (Del.2009).

dence on causation was, by her own expert's admission, speculative." [18]

 An attorney still has great latitude to crossexamine a medical expert witness about his opinion's basis. We have stated that an expert can offer opinions based on hypothetical factual situations.[19] The Appellate Division of the Superior Court of New Jersey noted that while New Jersey similarly limits medical expert testimony to a reasonable medical certainty or probability (not possibility), "testimony is not inadmissible merely because it fails to account for some particular condition or fact which the adversary considers relevant. The adversary may on cross-examination supply the omitted conditions or facts and then ask the expert if his opinion would be changed or modified by them." [20] For example, defense counsel had the right to inquire about whether the doctor recommended the plaintiff undergo an EMG test and whether the results of that test might change his expert opinion.

In contrast, the testimony excluded in this case did not test the bases of Harriott's permanency opinion. Rather, defense counsel asked the doctor to speculate about the possible medical consequences of possible treatment courses an EMG test might reveal.[21] When Rogers's counsel asked Harriott to opine on whether O'Riley's injuries were permanent based on treatment *possibilities* an EMG test *might* reveal, counsel impermissibly went beyond testing the credibility of Harriott's opinion to inviting Harriott to speculate. Therefore, the trial judge properly excluded that portion of Harriott's testimony during the first trial. Because the initial evidentiary ruling giving rise to the trial judge's decision to grant a new trial was not erroneous, we hold that trial judge abused his discretion when he granted the motion for a new trial.

## IV. CONCLUSION

Therefore, we VACATE the Superior Court's judgment ordering a new trial, all subsequent rulings, and the second jury verdict and REMAND with instructions to reinstate the original jury verdict. Jurisdiction is not retained.

18. *Id.* at 1019. The trial judge in the instant case relied on a Florida District Court of Appeal case to conclude that a crossexaminer can question a medical expert about possibilities rather than probabilities. *O'Riley v. Rogers*, 2011 WL 3908404, at *3 n. 12 (Del.Super. Aug. 30, 2011) (citing *AT & T Wireless Servs., Inc. v. Castro*, 896 So.2d 828 (Fla.Dist.Ct.App. 2005)). We disagree with this conclusion to the extent it would permit a medical expert to offer his opinion, in this case about permanency, based on speculative possibilities. *See Floray v. State*, 720 A.2d 1132, 1136 (Del. 1998) (citations omitted) (holding that "when an expert offers a medical opinion it should be stated in terms of 'a reasonable medical probability' or 'a reasonable medical certainty' " (footnote omitted)).

19. *Stafford v. Sears, Roebuck & Co.*, 413 A.2d 1238, 1245 n. 10 (Del.1980).

20. *State v. Freeman*, 223 N.J.Super. 92, 538 A.2d 371, 384 (Ct.App.Div.1988) (citations omitted).

21. Harriott testified concerning what O'Riley's EMG might show (nerve compression in the elbow, nerve compression in the neck, neuropathy, or something else) and how Harriott would treat what he speculated the EMG might show (moving the nerve, decompressive surgery, or something else).