IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY


STATE OF DELAWARE            :       Def. ID# 1012003724 ( R-1)

         v.                          :

JASON R. GALLAWAY          :


MEMORANDUM OPINION


DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF - GRANTED


DATE SUBMITTED: April 2, 2015

DATE DECIDED: July 16, 2015


Natalie S. Woloshin, Esquire and Benjamin S. Gifford, IV, Esquire, 3200 Concord Pike, P.O. Box 7329, Wilmington, DE 19803-7329, attorneys for defendant Jason R. Gallaway

Melanie Withers, Esquire; Kathryn J. Garrison, Esquire; and Casey Ewart, Esquire; 114 E. Market Street, Georgetown, DE 19947, attorneys for State of Delaware


STOKES, J.

Defendant Jason R. Gallaway was charged with, and found guilty of, murder by abuse or neglect in the first degree, in violation of 11 *Del. C.* § 634(a)(1),[1] in connection with the death of his three-month-old daughter, Marissa Gallaway ("Marissa").[2] Pending before the Court is defendant's motion seeking postconviction relief pursuant to Superior Court Criminal Rule 61 ("Rule 61").[3] Defendant has advanced numerous claims. The Court rules in defendant's favor on his claim that the trial was fundamentally unfair because he was not provided an expert to aid him in his defense. Consequently, the Court does not address defendant's other Rule 61 claims or his pending motion to reargue the Court's decision denying his request to supplement his Rule 61 motion.

On December 2, 2010, Seaford Police and emergency personnel responded to defendant's residence after he called for help. They found Marissa unresponsive. They obtained a pulse after performing CPR. They transported Marissa to Nanticoke Hospital and then A.I. DuPont Hospital for Children. She died from her injuries on December 5, 2010.

Defendant's basic version of what happened was as follows.[4] The day before her fatal

---

[1]This statute, 11 *Del. C.* § 634(a)(1), provides:

A person is guilty of murder by abuse or neglect in the first degree when the person recklessly causes the death of a child through an act of abuse and/or neglect of such child.

[2]The Delaware Supreme Court affirmed the judgment of the Superior Court in *Gallaway v. State*, 65 A.3d 564 (Del. 2013).

[3]Defendant filed two different motions, one on September 17, 2013, the other on September 19, 2013. The May 6, 2013 version of Rule 61 applies to this motion.

[4]There have been some inconsistencies in his explanations of what occurred. Those inconsistencies, however, are irrelevant for purposes of this decision.

1

injuries occurred, defendant had Marissa on his lap doing "exercises" with her. When he sneezed, his sneeze startled Marissa, which caused her to fall. Thereafter, Marissa had a lump on the back of her head. The next day, Marissa was on defendant's lap again while he performed the same exercises. She jumped or thrust herself out of his lap and hit her head on the floor.

Marissa sustained numerous injuries in her short life span: severe injuries to the upper part of her brain and brainstem; several skull fractures; bleeding in several areas around her brain; bruising under the chin, on her jaw, and on her forehead; a healing rib that had previously been fractured; retinal and vitreous hemorrhages; an injury to her left forearm; a previously fractured shoulder; and trauma to her abdomen. Defendant took responsibility for nearly all of the injuries Marissa suffered; he explained he was clumsy and often dropped Marissa or accidentally bumped her into walls.

Defendant was arrested for Marissa's death on December 5, 2010. On February 22, 2011, he was charged by indictment with murder by abuse or neglect in the first degree.

The jury had to decide whether the cause of Marissa's fatal injuries was accidental or non-accidental. The specific question as to the accidental aspect was whether her fatal injuries could have resulted from two falls from couch height which defendant said occurred on consecutive days. Experts were necessary to address these questions.

The State of Delaware's ("the State") experts were Dr. Cindy W. Christian, a pediatrician, and Dr. Robert A. Zimmerman, a pediatric neuroradiologist. They testified at both a *Daubert* hearing and the trial. They examined all of the information, including Marissa's various injuries and the nature of the fatal injuries. They concluded an accident or a fall from couch height did

2

not cause the fatal injuries.[5] Dr. Christian was particularly adamant that the short fall from couch height could not have caused her fatal injuries, stating in the *Daubert* hearing that medical data does not support that a baby who falls from 20 inches will succumb to fatal head injuries.[6] Dr. Christian testified at trial that she was aware of only one reported situation where a child died from a short fall.[7] During the *Daubert* hearing, Dr. Zimmerman testified he was unaware of any reports of a short fall actually killing an infant.[8] At trial, Dr. Zimmerman testified that one does not expect death to result from a fall under four and a half feet based upon studies conducted.[9] He also testified at trial that he is not aware of a fall under two feet killing any infant.[10] Both experts testified that non-accidental trauma caused Marissa's recent injuries and death.

Gallaway did not present any medical experts. He testified he accidentally dropped Marissa from couch height during the stretching exercises.

The jury found defendant guilty as charged. He was sentenced to life imprisonment without the possibility of probation or parole.

From the start, trial counsel knew he needed at least one expert, if not more, to testify on

---

[5]Transcript of January 30, 2012 Proceedings, Docket Entry No. 77 at E-58; E-70-71. Transcript of January 25, 2012 Proceedings, Docket Entry No. 84 at C-62; C-71-72.

[6]Transcript of October 24, 2011 Proceedings, Docket Entry No. 32 at A-92; A-127.

[7]Transcript of January 30, 2012 Proceedings, Docket Entry No. 77 at E-29-30.

[8]Transcript of October 25, 2011 Proceedings, Docket Entry No. 30 at B-21.

[9]Transcript of January 25, 2012 Proceedings, Docket Entry No. 84 at C-50-51.

[10]*Id.* at C-62.

3

behalf of the defense.[11] Also from the start, trial counsel was aware of successful postconviction proceedings in these types of cases based upon doctors challenging conventional wisdom. Trial counsel sent an email on January 11, 2011, to the Public Defender's administration saying he would need a doctor to evaluate the medical records. On January 12, 2011, he emailed Public Defender staff with medical backgrounds asking for the names of doctors they had used in the past. He was informed that these staff members would review the records "to see if there is a need to go further."

Trial counsel sent an email in May asking for expert names and parameters for funding. He was informed that the Public Defender's administration was waiting on a request from the staff members with medical backgrounds to recommend whether an expert was needed.

On May 24, 2011, trial counsel sent another email stating he needed a doctor who specializes in shaken baby cases to review the report.[12]

In late July, 2011, arrangements were made with Dr. Ophoven to review the medical records. Unfortunately, the total costs were understated. Upon discovering this error, staff from the Public Defender's office cancelled Dr. Ophoven.

---

[11]Trial counsel's attempts to retain experts is documented in a couple of sources. One source is a memorandum trial counsel prepared before trial regarding his expert witness problems. This memorandum is attached to an April 2, 2015 letter to the Court from postconviction counsel, Docket Entry No. 143. The other source is the Transcript of January 10, 2012 Proceedings, Docket Entry No. 82.

[12]Postconviction counsel has argued the testimony at some points indicated this case was a purely shaken baby case. No one ever concluded that Marissa's injuries resulted purely from being shaken. The testimony was she suffered a head injury resulting from a blunt force, not from shaking alone. Thus, postconviction counsel's arguments regarding the disputes within the medical community involving the possibility of inflicting injuries purely from shaking a baby without any blunt force applied to the head are irrelevant and ignored.

4

On August 10, 2011, trial counsel undertook his own research on the Innocence Project website to find other experts. He sent an email to the Public Defender's administration with information on these experts. The Public Defender's staff responded that these experts' fees were too high and told him that a staff member with a medical background would find other options.

On August 11, 2011, this staff member sent some other names of experts for trial counsel to contact.

In late August, trial counsel received approval to hire Dr. Dias, the only expert available for $1,000.00, the allotted sum. Dr. Dias reviewed the information and talked with defense counsel on September 30, 2011. Dr. Dias told trial counsel that the case was "indefensible" and he completely agreed with the State's experts. Of course, trial counsel determined the defense did not want to use Dr. Dias.

Trial counsel filed a *Daubert* motion to try to keep out, or limit, the testimony of the State's experts. He employed some information Dr. Dias had given him in questioning these experts. Thus, trial counsel questioned the State's experts about biomechanics and shaken baby syndrome and the disputes in the medical field regarding these issues. Ultimately, the Court ruled the State's experts could testify.[13]

Trial counsel continued to be concerned about not having a defense expert. On December 29, 2011, trial counsel emailed John Plunkett, M.D. to see if he would review, *pro bono*, the State's experts' reports. As it turns out, Dr. Plunkett is one of the experts that postconviction counsel was able to hire in connection with the pending Rule 61 motion.

On January 2, 2012, trial counsel spoke to Dr. Plunkett, who informed trial counsel of the

---

[13]Transcript of January 13, 2012 rulings, Docket Entry No. 74 at 5-57.

following. He confirmed defendant's story could be consistent with the injuries found on Marissa.  He was very critical of Dr. Dias, explaining that he is involved in four pending postconviction cases where Dr. Dias was the prosecution's expert and was "wrong every time."

In January, 2012, another attorney from the Public Defender's Office joined trial counsel in representing defendant.[14] On January 10, 2012, trial counsel met with the Court *ex parte* to seek a continuance of the trial.[15] The prosecutor later joined the conference.

Trial counsel pled their case for a continuance, arguing the following in support thereof. From the start, trial counsel knew they needed an expert in this case. They asked their office for an expert, but the request was denied. Counting the treating physicians, the State had five experts going into trial. Trial counsel ultimately were given funds which only were sufficient to hire Dr. Dias, who ended up agreeing with the State. Trial counsel continued to be bothered by the situation and talked with Dr. Plunkett, who agreed to review matters *pro bono*. Dr. Plunkett said, first, Dr. Dias was not a good expert, and second, the injuries could have occurred from a short fall. Dr. Plunkett thought there may be something there that he would be interested in seeing and that would allow him to challenge the State's experts. At this point, the Public Defender's administration was willing to give trial counsel additional funding because of the situation in which they found themselves. Dr. Plunkett would not be available for trial until July. Consequently, they talked to another expert, Dr. Parsons, who also agreed that Dr. Dias was a poor choice for an expert. Dr. Parsons would be available for trial sooner than July. The information was filed February 22, 2011, and the case was under a year old, which is not an

---

[14]Hereinafter, the term "trial counsel" refers to both attorneys.

[15]Transcript of January 10, 2012 Proceedings, Docket Entry No. 82.

6

excessive amount of time "for a case with this many experts and a possible life sentence."[16] Trial counsel were aware this expert could review things and conclude the defense did not have a case; however, they felt they owed it to the client to undertake a full investigation.

At that point, the prosecutor joined the conference to weigh in on the continuance request. The State acknowledged it was aware that trial counsel's efforts to retain an expert had been an issue "from Day One."[17] The State opined if a neurologist had determined the State was correct (as Dr. Dias did), then the defendant received that to which he was entitled: a review by a qualified expert.

Trial counsel responded they recently had discovered Dr. Dias was "characterized as being in cahoots with"[18] the State's doctors. Further, trial counsel stated there may be an alternative explanation as to the manner in which the injuries occurred. Trial counsel argued it was their obligation to do something in light of the life sentence their client was facing.

In ruling on the continuance request, the Court outlined the case's history as follows.[19] It previously had granted a continuance request so that defendant could retain an expert. The expert the defense retained could not offer an opinion helpful to defendant, although he did offer information which aided defense counsel in the *Daubert* motion. Now the defense was seeking another continuance thirteen days before trial in order to hopefully retain another expert who would offer some favorable or helpful opinions. The defense was not very far along with these

---

[16]*Id.* at 8.

[17]*Id.* at 21.

[18]*Id.* at 23.

[19]Transcript of January 13, 2012 Proceedings, Docket Entry No. 74 at 2-5.

new experts. The expert most readily available had not reviewed any of the medical records or police reports. If the Court granted the motion, the State most likely would want a *Daubert* hearing; thus, any continuance would be for a long period. The Court denied the request for a continuance, stating:

> I am afraid that we would continue the trial, and this expert might not be able to offer anything helpful to the defendant. Then we would have wasted more and more months with the experts in this case. It is awfully hard to get them.
>     So, absent any sort of guarantee or reasonable expectation that yet another expert would offer anything helpful to the defendant, I am simply not going to continue the case again.
>     So, that request is denied.[20]

Neither trial counsel nor appellate counsel argued that defendant's constitutional rights were violated because he did not have an expert available to aid him in his defense.

In what is, to this Court, an incredibly frustrating state of affairs, postconviction counsel obtained funds trial counsel was unable to obtain in order to retain two experts: John Plunkett, M.D. and Chris A. Van Ee, Ph.D.

As a ground for postconviction relief, defendant asserts:

As a result of the denial of appropriate funding by the office of the Public Defender to retain necessary expert witnesses, evidence demonstrating Mr. Gallaway's innocence was not presented to the jury and Mr. Gallaway was denied his Six and Fourteenth Amendment rights [and various rights under Delaware's Constitution].[21]

Defendant argues "significant evidence showing that Mr. Gallaway was actually innocent and

---

[20]*Id.* at 4-5.

[21]Petitioner's Revised Amended Motion for Postconviction Relief, Docket Entry No. 123 at 7.  No need exists to review the Delaware Constitutional rights argument because defendant, as the State notes, failed to establish such in accordance with the mandate of *Ortiz v. State*, 869 A.2d 285, 290-91 (Del. 2005), *cert. den.*, 546 U.S. 832 (2005).

directly disputing the State's contentions was available by retaining competent experts."[22]

According to defendant, had these experts been retained, they "would have told the jury that the fatal injuries could have been the result of an accidental fall. Such evidence would have likely changed the outcome of this case."[23]

Below is a review of pertinent portions of the reports of Dr. Van Ee and Dr. Plunkett.

Chris Van Ee, has a Ph.D. in Biomedical Engineering from Duke University and is a licensed professional engineer. His academic and scientific research has focused on determining injury causation and evaluating injury prevention strategies.

He states:

Based on the literature and research (some of which I have authored), short distance falls of three feet or less can result in serious, and sometimes fatal, head injury. Plunkett (2001) reports case-studies of 18 fatal head injuries resulting from short-distance falls. *** Other studies also point out that, although rare, low level falls can result in serious and fatal head trauma including subdural and retinal hemorrhage (Aoki 1984, Hall 1989, Smith 1996, Gardener 2007). Hall describes 18 children who died from falls of three feet or less. ... (one death was reported of an 8 month old who fell off of a sofa onto a hard wood floor suffering a subdural hematoma).[24]

He then addresses defendant's case, stating:

In this case, there is both injury evidence (healing injuries) and historical counts of trauma prior to Dec 2nd, 2010. This introduces the additional consideration that the reported accidental trauma of Dec 2nd may have resulted in a more severe outcome because of the preexisting injuries of the prior trauma. The Ibrahim study cited earlier in this report documents the types of serious head injury a child can suffer from falls of 3 feet or less. **It is possible that Marissa's death was the result of the cumulative effects of multiple injurious level impacts**. [Emphasis

---

[22]*Id.*

[23]*Id.*

[24]Van Ee's Report at 7, A003262.

9

added.][25]

Dr. Van Ee concludes as follows:

I find the reported history given by Mr. Gallaway of multiple accidents resulting in trauma to Marissa extremely disturbing; however, **it is not possible based on the current information to dismiss the reported accidental trauma history as the cause of Marissa's injuries and state that Marissa's injuries and death were the result of intentional abuse occurring on December 2nd 2010.** The given history of not just one, but two separate falls from Mr. Gallaway's lap two days in a row certainly implies a level of inattention, carelessness, and/or neglect. The constellation of Marissa's injuries with some being acute and some showing signs of healing are indicative of multiple episodes of trauma but it cannot be determined **from a biomechanics perspective** if the injuries were the result of the reported accidental trauma, abuse, or a combination thereof. [Emphasis added.][26]

Dr. Plunkett agreed that "[a] closed-head injury (blunt force injury) caused Marissa's death."[27] He also labeled her death a "homicide" but explained that "a pathologist uses the term 'homicide' to indicate a death that occurred because of the actions of another human being, whether intentional or not."[28] He would classify Marissa's death as a homicide even if an accidental drop caused her death.

Regarding the fatal injury, Dr. Plunkett states:

It is **possible** that an accidental "drop" on December 2 such as Jason described caused Marissa's fatal head injury. The fall to the non-carpeted floor would have occurred from a height of approximately three feet. An impact from this height **may** cause a skull fracture but does not usually cause significant cerebral trauma or dural compartment bleeding. However, a low velocity impact such as Jason described **may** cause a fatal injury. Thirty years ago, Aoki described this in the peer-reviewed literature, and no one has disproved his observations or

[25]*Id.* at 9, A003264.

[26]*Id.* at 10, A003265.

[27]Plunkett's Report at 1, A003244.

[28]*Id.*

10

conclusions. In addition, biomechanical analysis shows that a head impact to a non-yielding surface from a height of three feet exceeds established head injury thresholds. [Emphasis added.][29]

Dr. Plunkett concludes:

  In summary, it is **possible** that Marissa's fatal injury occurred from her father accidentally dropping her to the floor on December 2, 2012. However, she had several other injuries including (possibly traumatic) cyclous ascites, a possible occipital suture fracture, an old left 10th rib fracture, and possible healing acromion and humerus fracture. **If I were to conclude that abuse caused Marissa's injuries and death, I would base my opinion on the multiplicity of her injuries, not the improbability of any of the events that her father described.[30] \*\*\***[Emphasis added.][31]

 Dr. Plunkett's opinion does not, however, conclude that the drop was accidental and that

defendant was innocent, as defendant argues.[32] "A doctor's testimony that a certain thing is

possible is no evidence at all. \*\*\* [A] doctor's testimony can only be considered evidence when

---

[29]*Id.* at 2, A003245.

[30]Dr. Plunkett's explanation that he would look at the multiplicity of Marissa's injuries as a basis for reaching a conclusion that abuse caused her injuries and death is exactly what Dr. Christian did when she reached her opinion, to a reasonable degree of medical certainty, that Marissa died of abusive head trauma and child abuse and not from a short fall. Transcript of January 30, 2012 Proceedings, Docket Entry No. 77 at E-70-71. Dr. Christian testified:

  And again, I think it's important that I look at the totality of the findings in this case, not any one injury. Because the way that we know what's happened to the baby is not looking at one finding, not looking at only a skull fracture or only a bruise or only a rib fracture or only acromion fracture, but the way a doctor makes a diagnosis in a child abuse case, or in any case, is by taking a history, considering the history, and looking at all of the objective findings to come to the correct diagnosis. And if you look at all of the findings, there is only one correct diagnosis, and that's repeated injury to this baby.

[31]*Id.* at 4, A003247.

[32] Petitioner's Revised Amended Motion for Postconviction Relief, Docket Entry No. 123 at 7-26.

11

his conclusions are based on reasonable medical certainty that a fact is true or untrue."[33] In order to be admissible and considered, every medical opinion must be offered to a reasonable medical probability or reasonable certainty.[34] Thus, to establish actual innocence, defendant must present medical testimony that Marissa's cause of death was, to a reasonable degree of medical certainty, from a fall as described by defendant. Dr. Plunkett's report does not establish such.

Although the reports of Dr. Plunkett and Dr. Van Ee do not establish defendant's actual innocence, they provide a means for defendant to cross-examine and/or impeach the State's doctors' adamant and repeated testimony that children do not die from a couch height fall. This testimony on behalf of the State completely discounted the possibility that an accidental drop from the couch caused the fatal injuries.

Rule 61's procedural bars are significant here because defendant did not argue at trial or on appeal that he was denied an expert and thus, his constitutional rights were violated.[35]

---

[33]*Oxendine v. State*, 528 A.2d 870, 873 (Del. 1987). *Accord O'Riley v. Rogers*, 69 A.3d 1007, 1011 (Del. 2013).

[34]*Id.* The term reasonable degree of medical certainty is interchangeable with that of reasonable degree of medical probability. *Perkins v. State*, 920 A.2d 391, 395 (Del. 2007).

[35]In Rule 61, it is provided:

  *Bars to relief.* (1) Time limitation. A motion for postconviction relief may not be filed more than one year after the judgment of conviction is final or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court.
  (2) Repetitive motion. Any ground for relief that was not asserted in a prior postconviction proceeding, as required by subdivision (b)(2) of this rule, is thereafter barred, unless consideration of the claim in warranted in the interest of justice.
  (3) Procedural default. Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this

Defendant must overcome the procedural bars in one of two ways. Either defendant must meet the cause and prejudice standard in Rule 61(i)(3), or he must establish a miscarriage of justice as set forth in Rule 61(i)(5). The miscarriage of justice exception may be established by a showing of ineffective assistance of counsel[36] or by otherwise establishing a violation of a constitutional right that undermined the fundamental legality, reliability, integrity or fairness of the proceedings.

Defendant has overcome the procedural bars by establishing that the trial was fundamentally unfair because he was not provided an expert to aid his defense. This significant issue must be addressed despite the procedural bars.[37]

An indigent defendant must have "access to the raw materials integral to the building of an effective defense."[38] Such access may require retaining an effective expert.[39] In *Chao v.*

---

court, is thereafter barred, unless the movant shows
  (A) Cause for relief from the procedural default and
  (B) Prejudice from violation of the movant's rights.
  (4) Former adjudication. Any ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.
  (5) Bars inapplicable. The bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.

[36]*State v. Walker*, 2015 WL 3654806, *2 (Del. Super. June 8, 2015).

[37]*State v. Bradley*, 2015 WL 3551898, *3-4 (Del. Super. June 5, 2015). *See Harley v. State*, 625 A.2d 279, 1993 WL 169132 (Del. April 27, 1993).

[38]*Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) ("*Ake*").

[39]*Id.*

*State,*[40] the Supreme Court implied a case could exist in which the State might be constitutionally required to pay for a medical expert for an indigent defendant. It long has been the criminal justice standard to require defense counsel to expend appropriate funds to investigate the cause of a child's death in order to provide effective representation by cross-examination or impeachment of adverse witnesses.[41] There was never any doubt that trial counsel required expert assistance in this case.[42]

The State argues the Public Defender's Office did not deny defendant appropriate funding to retain a competent expert; the defense retained Dr. Dias, a competent expert, and it received funding to pay for Dr. Parsons. The State, quoting from *Ake*,[43] argues that "[a] defendant is not entitled to 'all the assistance that his wealthier counterpart might buy.'"[44] It further argues defendant has no right to keep shopping until he finds someone who will support his theory.

As to the contention the $1,000.00 given him to hire Dr. Dias was sufficient, defendant

---

[40]780 A.2d 1060 (Del. 2001), *overruled on other grounds, Govan v. State*, 2007 WL 3262145, at *1 (Del. Nov. 6, 2007).

[41]*Ex parte Briggs*, 187 S.W.2d 458, 467 (Tex. Crim. App. 2005) (setting forth the commentary to Standard 4-4.1 of the 1986 ABA Standards for Criminal Justice: The Defense Function).

[42]*See Ex parte Jimenez*, 364 S.W.3d 866, 888 (Tex. Crim. App. 2012), *cert. den.*, 133 S. Ct. 834 (2013) (In this case where the issue was the child's cause of death, the Court stated: "Applicant was clearly entitled to access to an expert who could speak knowledgeably on that question to build an effective defense...."). *See also Albanese v. State,* 725 A.2d 441, 1999 WL 87154 (Del. 1999) (defendant had an expert to testify whether she caused child's injury and ultimate death in a murder by abuse or neglect case).

[43]470 U.S. at 77.

[44]State's Answer to Motion and Amended Motion for Post-Conviction Relief, Docket Entry No. 128 at 18.

responds:

> [The argument] fails to appreciate that because the funding was so limited Dr. Dias could not be used as a consulting expert at trial or the *Daubert* hearing, which certainly would have aided trial counsel in cross-examining the State's experts. The State's argument also fails to recognize that approval of $1,000 is a paltry sum when compared to what funding is actually needed to conduct a reasonable review of the voluminous records and reports.[45]

In this case, a series of events led to defendant not having access to an expert who could aid in an effective defense. The Public Defender's Office delayed in allocating any funds in the first instance. When it finally allocated funds, the amount allotted was a sum which this Court agrees was so meager in light of the facts and records of the case that it amounted to virtually nothing. Then, the expert retained was useless to the defense. He concluded that defendant was guilty. Furthermore, he was prosecutorial-oriented, not neutral. Because of the delay and the prolonged doling out of the Public Defender's funds, trial counsel was unable to contact any helpful experts until the eve of the second trial date. The Public Defender's actions and omissions regarding expert funding in this case caused substantial delay resulting in the denial of trial counsel's request for a continuance. The administration of the Public Defender's Office created the situation where trial counsel was required to enter trial without an expert who could aid in an effective defense.

Dr. Plunkett and Dr. Van Ee's reports establish that the State's experts' testimony adamantly denying that a child could die from a fall from couch height was subject to attack through informed cross-examination and/or impeachment. The defense's only means for providing the jury with information to allow it to determine the validity of the State's experts'

---

[45]Petitioner's Reply in Support of His Amended Motion for Postconviction Relief, Docket Entry No. 137 at 5.

15

conclusions was through experts. If this information had been available to the jury and if the jury, following the jury instructions,[46] had discounted the State's experts' opinions, a reasonable doubt thereby could have been raised. This is especially acute where the credibility of the defendant was an essential issue concerning his case and Marissa's fall(s). His lay testimony had no chance in face of the unrebutted premises of the experts.

Thus, while it is true that the proffered defense opinions do not state the cause of Marissa's death was accidental, whether the outcome of the trial most likely would be different is not free from doubt. Under the totality of the circumstances, defendant has shown that he was

---

[46]The Court gave the jury two pertinent instructions. The first concerned the credibility of witnesses and conflicts in testimony:

In considering the credibility of witnesses and in considering any conflict in testimony, you should take into consideration each witness' means of knowledge, strength of memory and opportunity for observations, the reasonableness or unreasonableness of the testimony, the consistency or inconsistency of the testimony, the motives actuating the witness, the fact, if it is a fact, that the testimony has been contradicted, the witness' bias, or prejudice, or interest in the outcome of this litigation, the ability of the witness to have acquired the knowledge of the facts to with the witness testified, the manner and demeanor of the witness while on the witness stand, and the apparent truthfulness of the testimony, and any and all other facts and circumstances shown by the evidence which affect the credibility of the testimony.

The second addressed expert witnesses:

In this case, you have heard the testimony of expert witnesses. Expert witnesses may state their opinions and reasons for their opinions because, by their education and experience, they have become "expert" in their field. The value of such testimony depends upon the learning and skill of the expert and varies with the circumstances of the case.
You should give expert testimony the weight that you consider appropriate. In addition to the factors already mentioned for weighing the testimony of any other witness, you may consider the qualifications of the expert witnesses, **the reasons for the experts' opinions, and the reliability of the information or assumptions upon which they are based.** [Emphasis added.]

16

forced into trial without the basic tools of a defense: the hiring of an expert who could provide trial counsel with information to allow them to cross-examine and/or impeach the State's witnesses. Two jurisprudential principles come to mind. The first is: "A just balance preserves justice."[47] The second is: "Fairness is what justice really is."[48]  Defendant was denied meaningful access to justice; the trial was fundamentally unfair. This Court has no confidence in the outcome of the trial given the absence of defense experts, and thus, the verdict cannot stand.

The Court will be in contact with the parties in the immediate future to schedule a proceeding where defendant's bond shall be reviewed, and a scheduling order regarding the new trial shall be entered. With regard to defendant's new trial, the Court underscores the obvious: defendant shall be allocated sufficient funds to hire experts who will aid in his defense.

IT IS SO ORDERED.

---

[47]Latin proverb, W. Gurney Benham, *Putnam's Complete Book of Quotations, Proverbs and Household Words*, 1927.

[48]Potter Stewart, *Time*, October 20, 1958.